**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STEVEN DOUGLAS COLEMAN,

                Plaintiff,

v.

MARÍA KIM GRAND,

                Defendant.

Case No. 1:18-cv-05663 (JBW) (RLM)

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

I.    Introduction ...................................................................................................1

II.    Undisputed Material Facts ............................................................................4

      A.    The Parties and the Beginning of Their Relationship ...........................4

      B.    The Relationship Grows Tumultuous and Ends .....................................5

      C.    Ms. Grand's Letter ................................................................................6

      D.    The Reaction to Grand's Letter By the Recipients .................................9

      E.    Coleman's Letter .................................................................................10

      F.    Coleman Sues Grand ............................................................................11

      G.    Parties' Statements Following Coleman's Filing of This Action ..........12

      H.    Mr. Coleman's Damages Claim ..........................................................13

III.    Standard of Review .....................................................................................16

IV.    Argument ....................................................................................................17

      A.    Grand's Letter is Non-Actionable Opinion ..........................................17

            1.    Grand's Letter Lacks Precise Meaning .....................................19

            2.    The Dispute Does Not Concern Verifiable Facts ......................20

            3.    The Social Context of the Letter Clarifies That Its Content Is Opinion ....23

      B.    The Factual Content of Grand's Letter Is Substantially True ................25

      C.    Grand's Letter Is Not Capable of a Defamatory Meaning, Let Alone Libel *Per Se* ................................................................................................28

            1.    There is no libel per se. ............................................................29

            2.    There Is No Libel at All, and Coleman Is Libel Proof on This Topic .......31

      D.    Coleman Suffered No Damages, Special or Otherwise .........................33

            1.    No Special Damages Can Be Proven .......................................33

2.  No General Damages Can Be Proven, and Nominal Damages Fail to Satisfy the Amount-in-Controversy Requirement ......................................36

E.  Plaintiff Cannot Show Causation............................................................37

F.  Any Damages Are Insufficient To Satisfy the Amount-in-Controversy Requirement..............................................................................................39

G.  Plaintiff Cannot Meet Any Standard of Fault........................................39

1.  A Heightened Actual-Malice or Gross-Irresponsibility Standard Applies ............................................................................................39

2.  Plaintiff Cannot Satisfy the Actual Malice Standard...............41

V.  CONCLUSION......................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld*,
    80 N.Y.2d 130, 603 N.E.2d 930 (1992)...............................................18

*Alston v. Flagstar Bank, FSB*,
    609 F. App'x 2 (D.C. Cir. 2015).......................................................39

*Alternative Electrodes, LLC v. Empi, Inc.*,
    597 F. Supp. 2d 322 (E.D.N.Y. 2009) ..................................................34

*Anas v. Brown*,
    269 A.D.2d 761, 702 N.Y.S.2d 732 (2000) ...................................40, 41

*Aronson v. Wiersma*,
    65 N.Y.2d 592, 483 N.E.2d 1138 (1985)...............................31, 32, 35

*Azzaro v. Cty. of Allegheny*,
    110 F.3d 968 (3d Cir. 1997)...........................................................40

*Bowes v. Magna Concepts, Inc.*,
    166 A.D.2d 347, 561 N.Y.S.2d 16 (1st Dep't 1990) ...............................29

*Brian v Richardson*,
    87 N.Y.2d 46 (1995) ..................................................................18

*Brown v. GC Am., Inc.*,
    2005 WL 3077608 (N.D. Ill. Nov. 15, 2005) .......................................30

*Caesars Entm't Operating Co. v. Appaloosa Inv. L.P. I*,
    48 Misc. 3d 1212(A), 18 N.Y.S.3d 577 (N.Y. Sup. Ct. 2015) ..................38

*Carter v. Visconti*,
    233 A.D.2d 473, 650 N.Y.S.2d 32 (1996) ..........................................26

*Cassini v. Advance Publications, Inc.*,
    41 Misc. 3d 1202(A), 977 N.Y.S.2d 665 (Sup. Ct. 2013), aff'd, 125 A.D.3d
    467, 4 N.Y.S.3d 4 (N.Y. App. Div. 2015) ...........................22, 23, 24, 25

*Castro v. Total Home Health, Inc.*,
    2004 WL 1588261 (N.D.Ill. July 9, 2004)...........................................30

*Catalanello v. Kramer*,
    18 F. Supp. 3d 504 (SDNY 2014).....................................................22

*Celle v. Filipino Reporter Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000)............................................................18, 34

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................17

*Chapadeau v. Utica Observer-Dispatch, Inc.*,
    38 N.Y.2d 196, 341 N.E.2d 569 (1975).............................................40

*Cochran v. Indianapolis Newspapers, Inc.*,
    175 Ind. App. 548, 372 N.E.2d 1211 (2d Dist. 1978)........................40

*Coleman. Cerasani v. Sony Corp.*,
    991 F. Supp. 343 (S.D.N.Y. 1998)....................................................38

*Cweklinsky v. Mobil Chem. Co.*,
    364 F.3d 68 (2d Cir. 2004).................................................................38

*Dagel v. Lemcke*,
    245 Ga. App. 243, 537 S.E.2d 694 (2000)........................................38

*Deupree v. Iliff*,
    860 F.2d 300 (8th Cir. 1988) .............................................................21

*DiBella v. Hopkins*,
    403 F.3d 102 (2d Cir. 2005)...............................................................39

*Douglass v. Hustler Magazine, Inc.*,
    769 F.2d 1128 (7th Cir. 1985) ...........................................................33

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
    314 F.3d 48 (2d Cir. 2002).................................................................37

*Franklin v. Pepco Holdings, Inc.*,
    875 F. Supp. 2d 66 (D.D.C. 2012) .....................................................31

*Galasso v. Saltzman*,
    42 A.D.3d 310, 839 N.Y.S.2d 731 (2007) .........................................35

*Gallo v. Alitalia-Linee Aeree Italiane-Societa*,
    585 F. Supp. 2d 520 (S.D.N.Y. 2008)................................................31

*Gentile v. Grand St. Med. Assocs.*,
    79 A.D.3d 1351, 911 N.Y.S.2d 743 (2010) .......................................21

*Geraci v. Probst*,
    15 N.Y.3d 336, 938 N.E.2d 917 (2010)..............................................37

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)............................................39

*Goetz v. Kunstler*,
   164 Misc. 2d 557, 625 N.Y.S.2d 447 (Sup. Ct. 1995)............................................25

*Golub v. Enquirer/Star Grp., Inc.*,
   89 N.Y.2d 1074, 681 N.E.2d 1282 (1997)............................................30

*Guccione v. Hustler Magazine, Inc.*,
   800 F.2d 298 (2d Cir. 1986)............................................32

*Guerrero v. Carva*,
   10 A.D.3d 105 (1st Dep't 2004) ............................................18

*Haynes v. Alfred A. Knopf, Inc.*,
   8 F.3d 1222 (7th Cir. 1993) ............................................21, 26

*Hayt v. Newsday, LLC*,
   No. 2018-00361, 2019 WL 5057864 (N.Y. App. Div. Oct. 9, 2019)............................................40

*Howard v. Block*,
   90 A.D.2d 455, 454 N.Y.S.2d 718 (1982) ............................................35

*Huggins v. Moore*,
   94 N.Y.2d 296, 726 N.E.2d 456 (1999)............................................40

*Hughes v. Twenty-First Century Fox, Inc.*,
   304 F. Supp. 3d 429 (S.D.N.Y. 2018)............................................30, 42

*Indiana Hi–Rail Corp. v. Decatur Junction Ry. Co.*,
   37 F.3d 363 (7th Cir.1994) ............................................39

*James v. Gannett Co.*,
   40 N.Y.2d 415, 353 N.E.2d 834 (1976)............................................29, 40

*Koussevitzky v. Allen, Towne & Heath, Inc.*,
   188 Misc. 479, 68 N.Y.S.2d 779 (Sup. Ct. 1947), aff'd, 272 A.D. 759, 69
   N.Y.S.2d 432 (App. Div. 1947)............................................39

*Krzesaj v. New York City Dep't of Educ.*,
   No. 16 CIV. 2926 (ER), 2017 WL 1031278 (S.D.N.Y. Mar. 15, 2017)............................................34

*Larson v. Albany Med. Ctr.*,
   252 A.D.2d 936, 676 N.Y.S.2d 293 (1998) ............................................35

*Liberman v. Gelstein*,
   80 N.Y.2d 429, 605 N.E.2d 344 (1992)............................................41

*Love v. William Morrow & Co.*,
  193 A.D.2d 586, 597 N.Y.S.2d 424 (1993) ...............................................26

*Lyons v. New Am. Library, Inc.*,
  78 A.D.2d 723, 432 N.Y.S.2d 536 (1980) .................................................33

*Man v. Warner Bros. Inc.*,
  317 F. Supp. 50 (S.D.N.Y. 1970) .............................................................39

*Mann v. Abel*,
  10 N.Y.3d 271 (2008) ........................................................................18, 19

*McCabe v. Rattiner*,
  814 F.2d 839 (1st Cir. 1987) ...................................................................23

*McCarthy v. Am. Int'l Grp., Inc.*,
  283 F.3d 121 (2d Cir. 2002) ...............................................................16, 17

*Meehan v. Snow*,
  494 F.Supp. 690 (S.D.N.Y.1980), rev'd on other grounds, 652 F.2d 274 (2d
  Cir.1981) ...............................................................................................36

*Michel v. NYP Holdings, Inc.*,
  816 F.3d 686 (11th Cir. 2016) .................................................................39

*Nolan v. State*,
  158 A.D.3d 186, 69 N.Y.S.3d 277 (N.Y. App. Div. 2018) ........................35

*November v. Time Inc.*,
  13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963)......................29

*Nunez v. A-T Fin. Info. Inc.*,
  957 F. Supp. 438 (S.D.N.Y. 1997)...........................................................36

*Orlowski v. Koroleski*,
  234 A.D.2d 436, 651 N.Y.S.2d 137 (1996) (order after trial) .................36

*Penn Warranty Corp. v. DiGiovanni*,
  10 Misc. 3d 998, 810 N.Y.S.2d 807 (Sup. Ct. 2005).............................25

*Phillip v. Sterling Home Care, Inc.*,
  103 A.D.3d 786, 959 N.Y.S.2d 546 (2013) .............................................38

*Prozeralik v. Capital Cities Commc'ns, Inc.*,
  82 N.Y.2d 466, 626 N.E.2d 34 (1993)......................................................39

*Rall v. Hellman*,
  284 A.D.2d 113, 726 N.Y.S.2d 629 (2001) .............................................36

*Rappaport v. VV Publ'g Corp.*,
163 Misc. 2d 1, 618 N.Y.S.2d 746 (Sup. Ct. 1994), aff'd, 223 A.D.2d 515,
637 N.Y.S.2d 109 (1996) ...................................................................................21

*Rejent v. Liberation Publications, Inc.*,
197 A.D.2d 240, 611 N.Y.S.2d 866 (1st Dep't 1994) ..........................................31

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
42 N.Y.2d 369, 366 N.E.2d 1299 (1977) .............................................................24

*Roche v. Mulvihill*,
214 A.D.2d 376, 625 N.Y.S.2d 169 (1st Dep't 1995) ..........................................40

*Schoepflin v. Coffey*,
162 N.Y. 12, 56 N.E. 502 (1900) .........................................................................37

*Sharratt v. Hickey*,
20 A.D.3d 734, 799 N.Y.S.2d 299 (2005) ...........................................................36

*Stepanov v. Dow Jones & Co, Inc..*,
120 A.D.3d 28, 987 N.Y.S.2d 37 (2014) .............................................................28

*Talbot v. Johnson Newspaper Corp.*,
124 A.D.2d 284, 508 N.Y.S.2d 80 (1986) ...........................................................35

*Thai v. Cayre Grp., Ltd.*,
726 F. Supp. 2d 323 (S.D.N.Y. 2010)..............................................................34, 36

*Time Inc. v. Sand Creek Partners, L.P.*,
825 F. Supp. 210 (S.D. Ind. 1993) .......................................................................40

*Tourge v. City of Albany*,
285 A.D.2d 785, 727 N.Y.S.2d 753 (2001) .........................................................35

*Vasarhelyi v. New Sch. for Soc. Research*,
230 A.D.2d 658, 646 N.Y.S.2d 795 (1996) .........................................................35

*Wieder v. Chem. Bank*,
202 A.D.2d 168, 608 N.Y.S.2d 195 (1994) .........................................................38

*Yonaty v. Mincolla*,
97 A.D.3d 141, 945 N.Y.S.2d 774 (2012) ...........................................................28

**Statutes**

New York Law of Torts § 1:55 ..............................................................................36

**Other Authorities**

Restatement (Second) of Torts § 575 (1977)..................................................................36

# I. Introduction

Defendant María Grand ("Grand") respectfully asks this Court to grant her motion for summary judgment because the letter at issue, about a tumultuous sexual and professional relationship, contains protected opinion and Plaintiff Steven Coleman ("Coleman") has suffered no damages as result of Grand's opinion. Indeed, Coleman's career flourished for over a year after Grand shared her opinion, and the alleged damage only occurred after he filed this lawsuit and participated in a publicity blitz about it. The evidence shows that performance venues are "looking forward" to this case being over so that things can return to normal and Coleman can perform again. Disposing of the case at this juncture is legally proper and in the interests of both Parties.

On November 14, 2017, Ms. Grand shared a letter with a small group of friends and colleagues, recounting her relationship with a former mentor that, as she lived it, was tainted by emotional abuse and an imbalance of power.[1] Although not mentioned by name in the letter, that mentor was Coleman. Coleman, in response, mounted a counter campaign that reached a far broader audience than Grand's letter to "prove" that she is a "liar." This lawsuit is part of that campaign. Among other ways of supposedly "proving" that he has not emotionally abused Grand, Coleman filed nude photos of Grand on this Court's public docket after she sought a protective order to protect discovery materials.[2]

Coleman's lawsuit is fundamentally misguided and legally flawed. Grand's letter expressed her personal feelings about the Parties' complicated and volatile relationship, and Coleman cannot prove falsity for the simple reason that she expressed her own heartfelt

---

[1] Grand Nov. 14, 2017 Letter, attached to White Decl. as Ex. A; and Grand Nov. 14, 2017 email, attached to White Decl. as Ex. B.

[2] *See* Plaintiff's Opp. to the Mot. for a Protective Order. ECF Nos. 34-35 (asserting that he "is respectful and considerate of Ms. Grand in the public sphere.").

opinions. The inner postures of the Parties' hearts and minds and the way that they experienced a relationship cannot be proven as a matter of fact and, therefore, cannot be decided by a jury.

The material facts are not in dispute. Grand, an aspiring jazz musician, engaged for about five years in a sexual relationship with Coleman, an accomplished and renowned jazz musician. When they met Ms. Grand was only 17 years old and Coleman, 52. They agree that their sexual relationship (1) involved no criminal conduct and (2) was intertwined with mentor-apprentice and, later, professional relationships. They further agree that their relationship was tumultuous, marked by highs and lows and they both, at one time or another, pursued the other.

But the Parties disagree about what this all means. Grand believes the relationship was tainted by a power imbalance due to Coleman's age and fame. In her view, this allowed Coleman to leverage the professional opportunities he could open or close for her to achieve various advantages, primarily sexual, in their personal relationship. For his part, Mr. Coleman—who is married and admits to this and many other adulterous relationships—also sees a connection between the Parties' sexual and professional relationships. But he insists it was Ms. Grand's idea to use sex as a tool for career gain and asserts "*often* she pursued me."[3]

Despite his repeated statements that the Parties are entitled to their respective opinions,[4] Coleman erroneously insists that he can disprove Grand's letter. He thinks he can do this by presenting evidence that he claims demonstrates that Grand desired and pursued a sexual relationship with him. But Grand does not deny that. Her letter disclosed that that she was "hooked" on Coleman, "craved his attention," and initiated many aspects of the relationship.[5]

---

[3] Coleman May 5, 2018 Letter to We Have Voice at 1, attached to White Decl. as Ex. C (emphasis in original).
[4] *See, e.g.,* Coleman May 16, 2016 text message, attached to White Decl. as Ex. D ("My reality is not your reality. I just don't agree with you about all this…Whatever, you can't force people to agree to the way you see things, there are 'always' at least two perspectives in any relationship, not just your perspective is the truth."); and Coleman July 28, 2018 email, attached to White Decl. as Ex. E at 2 ("I completely support Maria's right to tell her story.").
[5] Ex. A at 3.

The disagreement is one of characterization: Coleman characterizes this as "sexual aggression,"[6] but Grand recalls it as "play[ing] in to his game."[7] This is a dispute of opinion, not fact.

Grand has never accused him of criminal conduct or any conduct that might undermine his career as a musician—a point underscored insofar as her letter reaffirms her "respect" for Coleman "as a musician."[8] The disagreement is over each other's motive for entering and carrying on this complex affair, and this is a paradigmatic dispute of opinion. Coleman's claim fails for the additional reason that he must also show actionable malice, both because Grand's communication was privileged and because it touched on matters of public importance about a public figure. Coleman cannot establish actual malice by clear-and-convincing evidence when the evidence is, at best, a muddle.

What's more, Coleman's claims are not defamation per se so he must prove special damages. He cannot do so as a matter of law, as the evidence shows that he has not suffered any monetary loss due to Grand's sharing her opinion with a small group of friends and colleagues. Further, it is doubtful that Grand's letter is even susceptible to a defamatory meaning—since accusing a man who admits to marital infidelity of being, in addition, a manipulative scoundrel does nothing on the margins to harm Coleman's reputation. In short, the dispute at the heart of this case is the stuff of opinion, and perhaps of literature, but not of law. A jury is not the right forum for this dispute, and summary judgment should be granted in Grand's favor on Coleman's claims.

---

[6] Ex. C at 2.
[7] Ex. A at 4.
[8] *Id.* at 6.

## II.    Undisputed Material Facts

### A.  The Parties and the Beginning of Their Relationship

Mr. Coleman is a 63-year-old professional jazz saxophonist. He is married but claims his wife knew about his adulterous relationships.[9] He concedes that, before, during, and after his affair with Grand, he also engaged in extramarital sex with other women.[10]

Ms. Grand, is 27 years-old and an up-and-coming professional musician from Switzerland who also plays the saxophone. She is not married. She concedes that, before, during, and after her relationship with Coleman, she engaged in sex with other men.[11]

The Parties agree that from 2009 to 2016 they were engaged in a complex relationship that was partly romantic, partly sexual, and partly professional. They first met in 2009, when Ms. Grand, then 17 and alone in the United States for the first time, attended an improvisation workshop presented by Coleman, then 52. Grand was a novice and admits she "understood nothing."[12] At the end of the lesson, she asked Coleman to teach her, and he declined, stating that "he did not teach beginners."[13] She "insisted and he finally agreed."[14]

They met for a lesson at another musician's house a few days later. Their personalities meshed, and Coleman saw promise in Grand as a musician. Though the Parties disagree on the details, they agree that these early encounters were marked by flirtation and personal affection,

---

[9] *See, e.g.,* Coleman Resps. to Interrogs. 1 & 14 at pp. 6, 27, attached to White Decl. as Ex. F.

[10] *See, e.g.,* Ex. F at 34.

[11] Disclosure of details concerning Grand's sexual relationships with *any* persons other than Coleman is protected by the Apr. 12, 2019 and May 30, 2019 Orders of this Court. ECF Nos. 42, 50. Plaintiff filed redacted copies of Exs. F, N, and V, attached to the White Decl., to protect confidential information covered by the Protective Order and Personally Identifiable Information. Defendant does not rely on the redacted information and Plaintiff is prohibited from doing so, and represented to the Court that he will not. *See* ECF No. 29 ("The Court made it clear during the discovery conference preceding the April 12 Protective Order that may not seek or use information about Ms. Grand's other sexual relationships…he has no intention of doing so.") As such, the redacted information is both protected, and should not be publicly disclosed, and is not relevant to the claims or defenses at issue in this case.

[12] Ex. A at 1.

[13] *Id.* at 1.

[14] *Id.*

but not sex. In 2012, Grand began to work with Coleman professionally. In 2014, Grand began to tour and perform with Coleman.

### B. The Relationship Grows Tumultuous and Ends

In 2011, Grand moved to New York, and the Parties agree that they began sleeping together. Grand's understanding was that, to continue playing with him, she had to sleep with him, but she concedes that, to some extent, she was "slightly manipulative."[15] Coleman believes that Ms. Grand wanted sex and that she was using him to advance her career—but he concedes that he also wanted sex, and that he otherwise "did not have an obligation to teach Maria" or give her any career opportunities.[16] He also concedes that Grand did not always want to have sex with him.[17]

The relationship continued, but the Parties agree it was tumultuous. Grand maintains that Coleman used his celebrity and status to initiate a sexual relationship, but she concedes that "she fell in love with him."[18] She concedes that the sex was never physically forced and that she sometimes initiated it.[19] She understood Coleman's words and behavior to mean that he would give her performance opportunities if she slept with him and would deny them if she did not.[20] She believes that sex was Coleman's motive for various decisions about professional opportunities including whether to expose Grand to renowned jazz musicians.[21] She also believes Coleman was jealous of her other relationships.[22] Coleman, on the other hand, believes Ms.

---

[15] *Id.* at 2.
[16] Ex. E at 1.
[17] *See* Coleman Dep., April 18, 2019, at 243:6-243:10, attached to White Decl. as Ex. G.
[18] Ex. A at 3.
[19] *See* Grand Dep., April 17, 2019, at 43:2-14, 57:13-16, attached to White Decl. as Exh H.
[20] *See* Ex. A at 3-4; Ex. H at 84:10-85:6.
[21] *See* Ex. A at 4; Coleman July 28, 2012 email, attached to White Decl. as Ex. I at 1 (Coleman admitting that he was considering taking Grand to see Sonny Rollins perform, but did not take her because she did not sleep with him).
[22] *See* Ex. A at 4; Ex. H at 120:2-9; and Coleman February 4, 2015 email, attached to White Decl. as Ex. J at 1 ("Well now you can marry your boyfriend who loves you. I'm not going to even give you the time of day anymore.

Grand had a powerful appetite for sex, repeatedly initiated, and that he in no way pressured her or was even jealous of other intermittent relationships. Both Parties, however, admit to frequent quarrels, breakups, make-ups, and a gamut of highs and lows.

The Parties parted ways for good in late 2016. They agree that quarrelling overtook the positive elements of the relationship. Grand concedes that she quit his ensemble at that time to remove herself from the situation.[23] Both think the other is to blame; both view the other as manipulative.

### C. Ms. Grand's Letter

On November 14, 2017, Grand circulated an e-mail and a letter attachment to about 38 friends and colleagues.[24] She chose that small group because she believed each member had a genuine interest in the issues.[25] Many recipients know both Grand and Coleman and had personal knowledge of their relationship.[26]

The Parties agree Grand sought to control the letter's distribution by asking— explicitly in the cover e-mail—that recipients not forward it.[27] Grand says she wanted to keep the letter from being circulated, without context, to people who were not interested in its topic.[28] Coleman says it was a "clandestine" "design" to deny him the ability to defend himself and harm his career.[29] Grand and Coleman concede that her hope to contain the letter was "naïve."[30]

---

*You'd have to crawl back on your knees with your mouth wide open before I even talk to you.*") (emphasis in original).
[23] Ex. A at 6.
[24] Grand Resp. to Interrogatories at 3, attached to White Decl. as Exhibit K.
[25] Ex. H at 77:12-80:22.
[26] Ex. H at 77:21-80:22; Ex. K at 3; Ex. F at 5-11.
[27] Ex. B; Ex. G at 308:24-309:23.
[28] Ex. B.
[29] Ex. E at 3.
[30] *Id.* at 3.

Coleman's wife and business manager both received the letter. Neither told Coleman about it for nearly two months. [31]

In the cover e-mail, Grand stated she was "sending you this so it can be the start of a larger conversation about what's acceptable and what's not."[32] The occasion, she said, was the ongoing "talk about sexism," particularly in the music industry, and she wrote to contribute to that discussion.[33] The letter tells her side of the story about her relationship with Coleman— though she identified him only as "X." The letter is long and emotional but the gist is as follows:

*First*, Grand wrote about the power "dynamic" of sexual relationships within the music industry. In her view, Mr. Coleman's status, age and ability created a power imbalance in the relationship, allowing him to use subtle means to get sex when Grand would prefer a relationship marked less by sex and more by affection and, at the same time, professionalism. Although she was initially inclined not to engage with Coleman on this basis, she—out of a complicated, difficult-to-describe sense of attraction to him—gave in, choosing to become sexually involved with Coleman. Grand believed her advancement as a musician depended on that involvement.

Grand experienced the relationship as a series of contingencies; her access to Coleman's knowledge and guidance, his professional circle of friends, and performance opportunities were predicated on her willingness to sleep with him. She had to do the latter to obtain the former. The letter recounts various episodes where she believed Coleman made decisions based on how their personal relationship was faring and, in particular, whether Grand was sleeping with him. The letter also recounts episodes where Grand found Coleman's actions or advances objectionable. In one instance Ms. Grand awoke in the middle of the night on a work trip to find Coleman half-

---

[31] Wong Dep., Apr. 30, at 63:2-65:14, attached to White Decl. as Ex. L.
[32] Ex. B.
[33] Ex. A at 1.

clothed and kissing her after she told him clearly she did not want to engage in sexual activity and had wanted to sleep in a separate bed.  In another instance, Mr. Coleman, again on a work trip, took photographs of Ms. Grand, then 18 years-old, while she slept in his hotel room.[34] Grand viewed Coleman's approach to the relationship—from the start when he concedes he flirted with a teenager while giving her a professional music lesson—as representative of a "systemic" problem in the industry.

*Second*, Grand made clear that these dynamics are "complex," and "there is not one single way to look at it."[35] She admitted that "I am not completely the victim and he is not completely an abuser."[36] She wrote: "I am conflicted as to what to make of it."[37] Grand stated that "my musical progress mattered" to Coleman and that she thought the relationship was "amazing."[38] She reiterated her "respect for him as a musician and as an elder."[39]

Importantly, she at no point alleged that their sexual relationship was non-consensual or even, in a legal sense, unwanted. To the contrary, the letter identifies several instances where Coleman propositioned her for sex, she declined, and he physically backed off. What's more, the letter makes clear that Grand initially asked Coleman for private lessons, that she developed a very strong emotional attachment to him, and that she actively sought out his company and, later, sex. To some extent, that latter push was, in her view, to "play" Coleman's "game"—i.e., trade sex for his companionship, lessons, and musical opportunity.[40]

*Third*, Grand felt an overwhelming frustration and disappointment that her musical talent and hard work did not matter as much to her advancement as her personal, and sexual,

---

[34] Ex. A at 2, 5.
[35] Ex. A at 2.
[36] *Id.* at 2.
[37] *Id.* at 7.
[38] *Id.* at 2.
[39] *Id.* at 6.
[40] *Id.* at 4.

relationship with Coleman. In other words, she feared that her participation with Coleman's band was viewed as a result of their personal and sexual relationship, not due to her talent.

*Fourth*, Grand recognized that her relationship with Coleman had positive aspects that were shared by her and Coleman, while the negative aspects of the relationship fell entirely on her. When the relationship fared poorly, Coleman had his money and status, but Ms. Grand had no security, no money, leaving her vulnerable to the vicissitudes of the relationship. Grand wrote that this is endemic of the entertainment industry generally, where men disproportionately have positions of power and repute, and use it to tilt the scales of such relationships against women, particularly those just starting their careers, who lack the leverage to protect themselves when professional relationships turn personal and sexual. She expressed the view that the industry is in need of reform and called the ongoing discussion about sexual harassment "long overdue."[41] She noted that this belief was confirmed by an experience at a conference where she and many others shared their stories about harassment in the jazz industry.

### D. The Reaction to Grand's Letter By the Recipients

The evidence shows that most recipients of Grand's November 14, 2017 letter "disregarded" it as a "peripheral matter."[42] Many knew about Grand and Coleman's relationship prior to Grand's letter, and that they had personally observed its instability.[43] Coleman continued to performed, received offers to perform, or otherwise worked with some of the recipients after Grand sent her letter up until at least December 2018.

---

[41] *Id.* at 1.
[42] Yulung Wang May 5, 2018 email, attached to White Decl. as Ex. M at 1 ("this seems like a big deal because it's your life, but for most people, it's an entirely peripheral matter."); Coleman January 12, 2018 email, attached to White Decl. as Ex. N at 1 ("we all disregarded what was in the letter.").
[43] Coleman May 28, 2018 email, attached to White Decl. as Ex. O at 1 (talking about other jazz musicians' knowledge of the Parties' relationship: "they knew what had really happened.")

### E. Coleman's Letter

On May 5, 2018, Coleman circulated a letter of his own to about 80 recipients to respond to Grand's letter. Coleman did not address his letter to Grand but rather to We Have Voice, a collective of musicians and performers formed to bring awareness to issues of inequity.[44] Some recipients of Coleman's letter had not received Grand's. The gist of his letter was that the relationship "was unusual, intense, argumentative, and passionate, but it was also completely consensual and should have been private."[45] He opined that "'[s]exual harassment' is about 'unwanted' sexual advances," and that Ms. Grand wanted sex with him.[46] He called Grand's letter "disingenuous and misleading" because "[t]here is no hint of Maria's sexual aggression."[47] Coleman attached to his letter pages of salacious communications between the two, which he cited for the proposition that Ms. Grand wanted, initiated, pursued, and desired sex with him. Prior to sending his letter, colleagues in the industry counseled him that his response would be seen by "most people" as a "provocation and confrontation" that would "diminish[] his public stature."[48]

Coleman also orally communicated the contents of both his and Grand's letters to "almost everybody he spoke to" prior to filing this lawsuit, "even those who weren't that interested."[49] Coleman urged friends to "speak up on their own" and do the same.[50]

On May 7, 2018 Coleman attended a public forum on effecting change in the jazz industry and tried to direct the topic of conversation to his and Grand's relationship. He admits

---

[44] Printout attached to White Decl. as Ex. P, available at https://too-many.org/who-we-are/.
[45] Ex. C at 1.
[46] *Id.*
[47] *Id.* at 2.
[48] Yulun Wang May 4, 2018 email, attached to White Decl. as Ex. Q at 1 ("most people will say that this is a provocation and confrontation, and you will not receive much sympathy…this tit-for-tat diminishes your public stature…You are not going to come off looking good if you engage this way with someone decades younger.")
[49] Ex. G, 350:12-353:12.
[50] Ex. Q.

that his actions might appear to some as a sort of "ambush[]" of a general meeting "with an issue that is personal to [him]."[51] The following day Coleman posted a video of the forum on his public Facebook account titled "The We Have Voice Collective Shuts Steve Coleman Down."[52] He admits that the members of the group were trying to distance themselves from the dispute and did not want to discuss it. He admits that he posted on Facebook to "call[] attention" to the issue.[53] Coleman also admits that between November 2017 and May 2018, he was unable to confirm a shift in the perception of him in the eyes of others in the jazz industry.[54]

### F. Coleman Sues Grand

On October 10, 2018, Coleman filed this action, alleging a single count of defamation by libel, to which he attached a full copy of Grand's November 14, 2017 letter. This was the first time that Grand's letter was made publicly available. Coleman knew that his Complaint made Grand's letter publicly available.[55] He amended on March 8, 2019.[56] The Complaint alleges that Grand accused Coleman of "a pattern of abuse, sexual harassment and sexual acts without the consent of Defendant."[57] Coleman asserted diversity jurisdiction based on his Pennsylvania residency and Grand's New York residency. He stated that the amount in controversy exceeds $75,000. He asserted "per se damages because the allegedly defamatory statements made by Defendant were inherently harmful, in that they addressed sexual morality and professionalism."[58] Coleman asserted further entitlement to "Actual Damages, Compensatory Damages, and Punitive Damages," but gave no itemization of those damages.[59] Subsequently, in

---

[51] Sophia Wong April 21, 2018 email, attached to White Decl. as Ex. R.
[52] Coleman May 8, 2018 Facebook post, attached to White Decl. as Ex. S.
[53] Coleman May 8, 2018 Facebook post, attached to White Decl. as Ex. T.
[54] Ex. G at 212:11-213:24.
[55] Coleman October 28, 2018 Instagram post, attached to White Decl. as Ex. U
[56] The First Amended Complaint is hereafter referred to as the "Complaint." ECF No. 22
[57] ECF No. 22 at ¶ 2.
[58] *Id.* at ¶ 58.
[59] ECF No. 22 at ¶ 59.

his damages disclosure, Coleman asserted damages involving attorney's fees, loss of performances—which all occurred after the Complaint was filed, a rough estimated loss of future earnings, and expenses for therapy and massages.[60]

### G. Parties' Statements Following Coleman's Filing of This Action

Coleman admits that he gave a statement to the New York Daily News after it ran an article on this lawsuit on October 12, 2018.[61] By contrast, Grand did not return any requests for comment at that time. On October 24, 2018, Coleman further promoted his lawsuit by publishing a 2,200-word statement on his public Facebook profile detailing the lawsuit and his defense, and directing readers to this docket. The post received seventy comments, eighty-six reactions, and was re-posted on at least six other public Facebook accounts.[62] The same day, Coleman published on his public Twitter account, directing readers to his Facebook post and this docket.[63] On October 28, 2018, Coleman published on his public Instagram account, titled "The Court of Public Opinion," directing readers to his Facebook post and this docket.[64] The evidence shows that many people who viewed Coleman's social media posts were not previously aware of the situation.[65] Coleman also published excerpts from Grand's letter on a public Wikipedia talk forum linked to his dedicated Wikipedia page during this time period.[66] After Coleman filed this lawsuit, various news and social media outfits publicized the dispute between Coleman and Grand.[67]

---

[60] Coleman Initial Disclosures, attached to White Decl. as Ex. V at p. 10.
[61] October 15, 2018 email, attached to White Decl. as Ex. W.
[62] Coleman October 24, 2018 Facebook post, attached to White Decl. as Ex. X.
[63] Coleman October 24, 2018 Twitter post, attached to White Decl. as Ex. Y, and available at: https://twitter.com/mbase/status/1055246977481560064
[64] Ex. U.
[65] Expert Report of Stephen Holzen, Image at 11, attached to White Decl. as Ex. Z, and available at: https://twitter.com/AbstractTruth/status/105438949733974835.
[66] Ex. G at 407:2-414:15; Coleman Wikipedia Post, attached to White Decl. as Ex. AA.
[67] Ex. X, p. 10.

Grand has made no social media posts about this case. After filing her Answer and Counterclaims,[68] Grand provided a short, nonspecific statement to the NY Daily News, printed in full in the outlet's November 14, 2018 article.[69] It is Grand's only public statement on this case.

## H. Mr. Coleman's Damages Claim

Mr. Coleman's career was unharmed after Ms. Grand sent her letter in early November 2017, indeed it flourished. A sampling of press headlines from this period show unrestrained acclaim:

- "His latest album, "Morphogenesis," is one of the best of the year." The San Diego Union-Tribune, November 25, 2017.[70]

- "The word 'genius,' like many other superlatives, seems apt for Mr. Coleman." The Chicago Maroon (The University of Chicago's newspaper), May 3, 2018.[71]

- "Best Jazz Albums of 2018": "[Coleman's album] just mesmerizes." Slate, December 10, 2018.[72]

- "Top 10 jazz releases of 2018 From Steve Coleman And Five Elements to Makaya McCraven, here were the top albums." The Denver Post, January 3, 2019.[73]

- "Best Music of 2018 The 2018 NPR Music Jazz Critics Poll": Coleman's work is "earth-shaking." NPR, January 5, 2019.[74]

Between the date Ms. Grand sent her letter in November 2017 through November 2018, Mr. Coleman's performance and workshop schedule was robust; he played at least 78

---

[68] ECF. No. 14.
[69] Nov. 14, 2018 NY Daily News Article, attached to White Decl. as Ex. BB; and available at https://www.nydailynews.com/news/ny-news-jazz-sax-player-steve-coleman-counter-sued-by-protege-20181114-story.html
[70] Ex. G at 120:23-123:15.
[71] Ex. G at 124:19-128:10.
[72] Ex. G at 129:16-131:18.
[73] Ex. G at 131:19-135:7.
[74] Ex. G at 135:8-137:24.

performances and workshops across the United States, Europe and in South America.[75] He

earned more money in 2018 than in 2017.[76] He performed and taught more in 2018 than in

2017.[77] Mr. Coleman's own damages expert was clear in her deposition:

> Q. So it is not your opinion that Mr. Coleman suffered any losses between the fall of 2017 and November 1, 2018; isn't that right?
>
> A. I did not calculate any losses during that period in this report, that's correct.[78]

Mr. Coleman's performance and workshop schedule during this timeframe also was

unhindered; Mr. Coleman *concedes* that every single performance and workshop scheduled

happened and was not cancelled.[79] In summary:

1. **Performances and workshops at the University of California, San Diego from November 27 through 28, 2017**: "Yes. That happened."[80]

2. **A residency in Los Angeles from December 1 through 15, 2017**: "Yes. [That happened.]"[81]

3. **A residency in Detroit from March 26 through April 6, 2018**: "As far as I remember, I performed on these dates," Coleman Apr. 18 Dep. 73:14-19, and "I don't have any reason to believe [any of these dates were canceled],"[82]

4. **A residency in Chicago from April 10 through April 29, 2018**: "Same answer."[83]

---

[75] Ex. G, Exs. 1 and 2.
[76] Ex. Z at 9.
[77] Ex. G, Exs. 1 and 2.
[78] Kucsma Dep., September 24, 2019, at 40:12-16, attached to White Decl. as Ex. JJ.
[79] Ex. G at 73:2-87:2 and Ex. 1 (reviewing his scheduled performances for 2018 as detailed on his website and confirming that he could not identify any that were cancelled); Ex. G at 94:17-95:17 and Ex. 2 (reviewing his performances scheduled in 2017 after Ms. Grand sent her letter and confirming that he could not identify any that were cancelled).
[80] Ex. G at 94:17-21.
[81] *Id.* at 95:14-17.
[82] *Id.* at 76:7-10.
[83] *Id.* at 77:9-11.

5. **Performances at the Village Vanguard from May 8 through May 13, 2018**: "The Village Vanguard, May 8th to May 13th, that happened."[84]

6. **European Tour from July 20 through July 29, 2018**: "the 20th to the 29th, European tour, all those dates happened."[85]

7. **European Tour from August 11 through August 14, 2018**: "The tour, August 11th to August 14th, that happened."[86]

8. **Chile Tour from October 1 through October 7, 2018**: "The tour in Chile, that happened […] those dates are accurate, what's listed[.]"[87]

9. **Performance at Lafayette College on October 19, 2018**: "The Lafayette College gig on October 19th, that happened."[88]

10. **Performances at The Jazz Gallery from October 20 through October 21, 2018**: "The Jazz Gallery gig on October 20th and 21st happened."[89]

11. **Performance at Duke University on November 2, 2018:** "The Duke University gig on November 2nd, that happened."[90]

12. **European Tour from November 10 through November 24, 2018**: "I remember those gigs as happening."[91]

As for December 2018, Mr. Coleman headlined a 12-performance residency at the Blue Whale in Los Angeles in December 2018.[92] The *only* cancellation Mr. Coleman experienced in 2018, was caused not by Ms. Grand sending her letter but by "the lawsuit coupled with the

[84] *Id.* at 83:14-15.
[85] *Id.* at 83:7-8.
[86] *Id.* at 83:16-17.
[87] *Id.* at 83:18-22.
[88] *Id.* at 83:23-24.
[89] *Id.* at 84:3-4.
[90] *Id.* at 84:3-4.
[91] *Id.* at 84:8-16.
[92] http://www.bluewhalemusic.com/event?view=calendar&month=12-2018

tabloid headline stories about it."[93] Correspondence from the venue cancelling the event was dated one month after Mr. Coleman filed his lawsuit and made clear that the cancellation was temporary and the organizer hoped that Mr. Coleman could return next year "once things settle."[94]

Throughout 2018, Mr. Coleman participated in numerous "workshop[s] with students" from various schools and universities indicating that his reputation to safely work with young students was intact in 2018.[95] Michigan State University, Dyett High School For the Arts, the University of Chicago, and Hyde Park Youth Symphony all invited Mr. Coleman to participate in workshops with students, youth and children in 2018.[96] In the fall of 2017, the University of California San Diego invited Mr. Coleman to offer master classes to students and the general public.[97]

### III.    Standard of Review

"Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d 121, 123–24 (2d Cir. 2002). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party." *Id.* at 124 (quotation marks omitted).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

---

[93] Ex. JJ, Ex. 10.
[94] Ex. JJ, Ex. 10.
[95] Coleman Apr. 18 Dep. Ex. 1.
[96] Coleman Apr. 18 Dep. Ex. 1.
[97] Coleman Apr. 18 Dep. Ex. 2.

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where, as here, the nonmoving party bears the ultimate burden at trial, the moving party may also meet the summary-judgment initial burden by "pointing out to the district court…that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once that initial burden is met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *McCarthy*, 283 F.3d at 124 (cleaned up).

## IV.    Argument

Grand's letter and the allegations underlying Coleman's lawsuit are, indisputably, statements based on perception, personal views, and opinions about the Parties' relationship the material facts of which are not in dispute. There is no need for a jury to assess, for example, whether or not Mr. Coleman forced himself on Grand on some specific date or even whether Coleman's advances were "unwanted" in a legally significant sense because such conduct is not alleged. Grand's letter contains no allegations of "criminal" conduct or legally defined sexual harassment. To the contrary, the letter was meant to be "the start of a larger conversation about what's acceptable and what's not" in sexual relationships in the music industry. Grand viewed herself as pressured to sleep with Coleman to earn a place in his performances and inner cadre of musicians; in Coleman's opinion, this was Ms. Grand's idea and something she subjectively wanted. That is not a dispute for a jury for several independent reasons.

### A.  Grand's Letter is Non-Actionable Opinion

Coleman cannot succeed on his claims because Grand's letter is composed entirely of her opinion of her relationship with Coleman, and opinion is an absolute defense to a defamation claim.

"[T]he New York Constitution provides for absolute protection of opinions." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000). "[A] libel action cannot be maintained unless it is premised on published assertions of fact." *Brian v Richardson*, 87 N.Y.2d 46, 51 (1995) (emphasis in original). "Conversely, expressions of opinion are cloaked with the privilege of speech afforded by the First Amendment, and false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions." *Guerrero v. Carva*, 10 A.D.3d 105, 111 (1st Dep't 2004) (quotation marks and citations omitted). "Whether a particular statement constitutes an opinion or an objective fact is a question of law." *Mann v. Abel*, 10 N.Y.3d 271, 276 (2008). *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 143, 603 N.E.2d 930, 937 (1992).

Grand's letter expresses an opinion about a complicated relationship and the Parties' motives for entering it and carrying it on, based on her perceptions and experiences. "I wrote a long letter about my experience," she wrote in a cover e-mail circulating the letter.[98] She sought to raise "awareness" and start a "conversation."[99]

Coleman reads accusations of a crime or civil offense that do not exist into Grand's letter. His reasons are transparent—assault or rape is a serious, and verifiable, crime. *Brian*, 87 N.Y.2d at 51; *Celle*, 209 F.3d at 177. But nothing in the letter alleges physical assault.

Again and again, the letter makes clear that, when Ms. Grand resisted Coleman's advances, he did not escalate to physical force. For example, Grand wrote that "In the middle of the night, I woke up. He was half-naked, kissing me on the lips. I pushed him away. After some protesting on my end he finally left, went back to his bed, and didn't bother me again for the rest

---

of the night."[100] Coleman does not dispute that this interaction happened, he just does not like that Grand wrote "some protesting" and "finally" because he feels that they "mischaracterize the interaction."[101] Minor discrepancies in witness recollection do not create actionable defamation.

The letter also expressly states that Grand "fell in love" with Coleman and chose to sleep with him, and it represents that Grand initiated many aspects of the relationship. The letter cannot plausibly be read to allege physically non-consensual sex, nor has Grand otherwise alleged any. Grand reiterated under oath: "there was never a time where I was raped" by Coleman.[102]

The factors New York courts use to differentiate statements of opinion from fact are: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact." *Mann v. Abel*, 10 N.Y.3d 271, 276, 885 N.E.2d 884, 886 (2008). When applied to Grand's letter, all three factors establish that her language was opinion.[103]

### 1. *Grand's Letter Lacks Precise Meaning*

The specific language of the letter does not contain a precise meaning which is readily understood—quite the opposite. Grand specifically framed her discussion in language clarifying just how complicated her relationship was with Coleman. She admitted that she was not entirely

---

[100] Ex. A at 5.
[101] Ex. F, at 17 ("She said no and I immediately stopped and left. Use of the phrases "some protesting" and "he finally left" intentionally mischaracterize the interaction.").
[102] Ex. H. at 168:20-21.
[103] As discussed below, there are some statements of fact in the letter (e.g., Coleman's snapping photos and climbing on Grand at night) and those are true or substantially true

a victim or Coleman a perpetrator.[104] She repeatedly states that she was confused by the relationship.[105] She still felt that Coleman "knows me better than anyone else does," and their relationship was not "all ugly and sad. Simply, the highs were very high and the lows were very low."[106] Her letter is about how she *experienced* this roller coaster. Ultimately, her conclusion was simply that Coleman was "not […] a good person" lacking character qualities.[107] That is paradigmatic opinion.

That Coleman's opinion of events is different than Grand's does not make hers untrue. Coleman's own expert witness hired to "assess the psychological factors" of this case, Dr. Robert Gordon ("Gordon"), agreed.[108] Gordon testified that "people in intimate relationships have different frames of reference."[109]

### 2. *The Dispute Does Not Concern Verifiable Facts*

The Parties' dispute—to the extent it can be crystallized—is over the non-verifiable topic of motive, each accusing the other of being sexually manipulative. The dispute is not over what happened; it is over why it happened and how each felt about it. The thrust of Grand's opinion is that Coleman gave her educational and career opportunities out of an ulterior motive of sex. Coleman's is the opposite: Ms. Grand used sex to manipulate him from the start, when she was just 17 years old and he was 52. He discloses hundreds of personal messages to prove that Grand is not a victim. But Grand has never contended that she is, and the status of a "victim," in all events, is not verifiable. Grand's letter discloses that she sought Coleman out for lessons, felt a strong attachment to him, kept coming back to him after breakups, and initiated many aspects of

---

[104] Ex. A at 1.
[105] *Id.* at 1-2.
[106] *Id.* at 3.
[107] *Id.* at 7.
[108] Expert Report of Dr. Robert M. Gordon, July 26, 2019, attached to White Decl. as Ex. CC at 1.
[109] Dr. Gordon Dep., September 25, 2019, 62:18-63:7, attached to White Decl. as Ex. DD.

their relationship. The dispute is *why* she did that: Coleman says she wanted sex; Grand says it was (at first) a relationship of affection and (later) one where she felt the need to "play his game."[110] The Parties' feelings and motivations cannot be known and judged by a finder of fact.

"Because statements concerning state of mind, such as hypotheses as to motivation, are not readily verifiable as true or false, courts of this State have consistently found them to be protected." *Rappaport v. VV Publ'g Corp.*, 163 Misc. 2d 1, 9, 618 N.Y.S.2d 746, 751 (Sup. Ct. 1994), aff'd, 223 A.D.2d 515, 637 N.Y.S.2d 109 (1996) (collecting cases). Just like statements that striking workers "do not want to work" or "hold jobs" and "simply want to make easy money" are not capable of being true or false, *Gentile v. Grand St. Med. Assocs.*, 79 A.D.3d 1351, 1353–54, 911 N.Y.S.2d 743, 745–46 (2010), so are statements that Grand was brought into Coleman's circle and performance team primarily because she slept with him—or, for that matter, that she was the one using sex for the purpose of obtaining those opportunities from Coleman. *Deupree v. Iliff*, 860 F.2d 300, 303 (8th Cir. 1988) (statement that sexual education instructor took personal, perverted satisfaction in sexual content of teaching material was non-actionable opinion); *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (husband/father's motives for abandoning family "can never be known for sure (even by [the husband/father])" and statement on them is opinion). Were the law otherwise, then an array of plainly opinionated complaints—"my boyfriend just wants sex," "she was hired just for her good looks"—would be actionable. The danger of turning every statement that hurts someone's feelings into an actionable defamation claim is clear.

Indeed, one can see how, under the same set of facts, two persons in an intimate relationship can come to opposing views as to the other's motives, a point underscored insofar as

---

[110] Ex. A at 5.

it is quite difficult to assess the degree to which Grand and Coleman actually dispute the facts of their relationship. *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 517–18 (SDNY 2014).

Even facts Grand does address consist largely of characterization that could result in a reasonable difference of opinion. *See Cassini v. Advance Publications, Inc.*, 41 Misc. 3d 1202(A), 977 N.Y.S.2d 665 (Sup. Ct. 2013), aff'd, 125 A.D.3d 467, 4 N.Y.S.3d 4 (N.Y. App. Div. 2015) ("The article's statement that plaintiff did not "figure into the equation," and suggestion that she was a "nobody," because she merely was available if Oleg Cassini and his mistress and editor "needed pencils sharpened," id., are incapable of verification and thus opinion"[.]"). Most are accompanied by a counter-characterization. Recall the night described by Grand in her letter where she awoke to Coleman kissing her; Coleman disputes, not Grand's recollections of the facts of this encounter, but her "use of the phrases 'some protesting' and 'he finally left'" because he believes they "intentionally mischaracterize the interaction."[111] Coleman disputes how Grand characterized his invitations for her to stay with him when he was in New York, because she also invited him to stay with her. *See* Ex. F at 17 (claiming that "[l]eaving that part out seriously mischaracterizes my invitations to her."). He does not dispute that they discussed having a "threesome"—a sexual interaction with three people—he just contends that the third person demurred, not Grand. *See id.* at 17 ("Maria is simply trying to demonize me."). There are no discrepancies of material facts because Coleman merely complains as to *how* Grand characterized various interactions—not whether the interaction happened. *See id.* at 17 ("We may have flirted at the second lesson [. . .] but I do not recall telling Maria that I wanted to have sex with her."); *id.* at 6 (disputing that Ms. Grand slept in a sleeping bag on the floor because he recalled that she slept on a mattress, *on the floor*); *id.* at 7 (disputing Ms. Grand's statement that,

---

[111] Ex. F at 17.

when she was 18, Coleman asked her for a chest massage because he recalls that "I asked for a back massage."). Coleman, concludes that "Maria's narrative is […] false." *Id.* at 9.

Coleman's reliance on his own narrative of events as "proof" is flawed and undermined by the evidence. His own psychological expert, after examining the "psychological factors" in this case, concluded that "obviously [Coleman's] biased."[112] That Grand experienced their relationship differently, that her "narrative" is different from Coleman's, is not a verifiable fact.

### 3. The Social Context of the Letter Clarifies That Its Content Is Opinion

Grand expressly offered her letter as a contribution to a "conversation about what's acceptable and what's not."[113] *Id.* (contribution to matter of public important suggests opinion). "In the context of public debate over a matter of community concern, first person narrative articles relating to that matter are commonly understood to be attempts to influence that public debate." *McCabe v. Rattiner*, 814 F.2d 839, 843 (1st Cir. 1987). Grand's letter commented on a matter of public concern: "sexism" in the music industry, "the strange process" and "dynamic" of merged sexual and professional relationships, and how that mix "disproportionately affects the women who enter the dynamic,"[114] resulting in a "systemic abuse of women all across the board."[115] Even then, she admitted that she is "eternally grateful" for Coleman's musical guidance,[116] because she "admire[s] and respect[s] [Coleman] immensely as a musician and an elder,"[117] the purpose of the letter was not to pick out Coleman as a criminal actor but rather to attempt to persuade the readers to rethink the scope of what is and is not considered valid behavior in the music industry.

---

[112] Ex. DD at 124:6-124:22.
[113] Ex. B.
[114] Ex. A at 1
[115] *Id.* at 8.
[116] *Id.*
[117] *Id.* at 7.

A second sense in which the "context" proves the letter's content to be opinion is that it discusses a complex relationship that defies being pinned down and was known personally by many of the letter's recipients. It is common experience that, in a messy divorce or breakup, the two sides have manifestly different perspectives on the same nucleus of factual material, especially on questions of motive, manipulation, and interpretation of cues in quarrels. It is also common experience that there is no possibility of verifying who is "right" about the relationship, because the differences are inherently subjective. Further, it is not unusual that persons in a relationship will have markedly different ideas of what went wrong and why when it ends. As Coleman's expert testified, "[Coleman]'s biased from his frame of reference just as Miss Grand would be biased from her frame of reference. And when they present things, they are going to present it from their bias."[118]  That type of divide is apparent here, as Coleman characterizes Grand's advances as "sexual" where she viewed the same advances as not (or at least less) sexual and more as advances of affection and admiration, *see* Letter at 2 ("I was attracted to him, but not in a physical way."), or else as preemptively appeasing Coleman. *See id.* at 4 ("There were many times where I played into his game.").[119] This dynamic has spawned a million jokes and many millions more stories about the "battle of the sexes," and Coleman is foolish to think a jury can resolve these timeless questions once and for all in this case.

Nor can the law punish people for talking about these things. Grand's letter "was…written from a subjective, rather obvious, point of view and did not purport to be anything else." *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 383, 366 N.E.2d 1299,

---

[118] Ex. DD at 123:9-125:3.

[119] Thus, Coleman's assertion that text messages or e-mails support his side of the story on Grand's sexual advances is unavailing. No one can ever know whether any message represents whether statements of a sexual nature were genuine or, instead, feigned to "play[] into [Coleman's] game" or achieve some sense of affection, certainly not a third party fact finder. Even Coleman admits that some documents, mainly those that support Ms. Grand's allegations, must be "explained" because "that is not what she meant." That inherent ambiguity only proves that this case is inherently incapable of being resolved as a factual matter.

1308 (1977); *Goetz v. Kunstler*, 164 Misc. 2d 557, 562, 625 N.Y.S.2d 447, 451 (Sup. Ct. 1995) (discussing various signals of subjectivity, even in statements that purport to be factual); *Penn Warranty Corp. v. DiGiovanni*, 10 Misc. 3d 998, 1005, 810 N.Y.S.2d 807, 815 (Sup. Ct. 2005). The small selection of recipients would certainly know that Grand was writing from a position of disappointment after a turbulent relationship ended. They would also know that Coleman likely viewed events differently.

The disagreement between Coleman and Grand's accounts, moreover, is based on a fundamental disagreement about what is or is not harassment. Mr. Coleman maintains that climbing on top of Grand in the middle of the night and kissing her[120]—after she made clear she did not want sexual interaction—was not harassment because "She said no and I immediately stopped and left."[121] He misses the mark that the initial act—him kissing her uninvited—was what Grand viewed as harassment.[122] When she confronted him the next day, he told her she was "making a big deal out of very minor thing."[123] His view that his behavior was not harassment, does not dictate whether or not she felt harassed.

### B. The Factual Content of Grand's Letter Is Substantially True

To be sure, the letter does contain some statements of fact, but even if they are material, they are true. In fact, Coleman admits to many of them. Truth is an absolute defense to a claim for defamation, and Coleman bears the burden to prove that a statement is false. "Under New York law it is well settled that truth is an absolute defense to a libel action. Even if a publication is not literally or technically true in all respects, the absolute defense applies as long as the

---

[120] *See* Ex. F at 17 (showing that Mr. Coleman does not dispute that Ms. Grand made clear ahead of time that she did not want sexual interaction with him, and that he kissed her while she slept).
[121] *Id.*
[122] *See* Ex. A at 5; Ex. H at 57:7-12.
[123] June 7, 2016 texts between Plaintiff and Defendant, attached to the White Decl. as Ex. EE.

publication is "substantially true.'" *Carter v. Visconti*, 233 A.D.2d 473, 474, 650 N.Y.S.2d 32, 33 (1996) (citation omitted).

The factual content of Grand's letter is concededly true in substance. Coleman does not dispute that he engaged in adulterous sexual relations with Grand, that he engaged in other affairs, that their affair was tumultuous and argumentative, that they frequently quarreled, or even that the sexual relationship was intertwined with, and to some degree in exchange for, a professional relationship. Coleman disputes that the relationship was physically non-consensual, but Grand never claimed otherwise. *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993) ("Beside these uncontested facts—not to mention the facts about Haynes in the book that he does not contend are false—the alleged falsehoods pale."). Coleman would have preferred that Grand discuss what he viewed as her own "sexual aggression," but that is, as discussed above, a dispute of opinion.

Even if it were a dispute of fact it would not be material. "[T]he appropriate inquiry is made, i.e., "whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Love v. William Morrow & Co.*, 193 A.D.2d 586, 588, 597 N.Y.S.2d 424, 426 (1993) (quotation marks omitted). It is dubious at best whether the readership would have viewed Coleman in a more favorable light had it been informed that, at times, Grand wanted sex. "The rule of substantial truth is based on a recognition that falsehoods which do no *incremental* damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993). The difference between an adulterer who sleeps with a female student 36 years younger and one who, on top of that, is rude and manipulative is a marginal

difference at most. Indeed, the evidence shows that many people who learned of Grand's letter objected to the affair itself, rather than to other aspects of Coleman's behavior to Grand.[124]

In all events, even assuming Coleman can show that some factual content of the letter is inaccurate—a highly doubtful proposition—there is sufficient factual content that Coleman has *conceded is accurate* that would justify Grand's ultimate assertions regarding harassment and emotional abuse. For example, Mr. Coleman admits (as he must) that he climbed on top of Ms. Grand half-naked in the middle of the night to kiss and caress her.[125] Although he asserts that this was not an instance of harassment because he desisted once she resisted his advance, this protestation ignores that Grand is entitled to view the advance itself as offensive, abusive, and harassing—even if he (quite oddly) disagrees. Similarly, Coleman does not dispute that he snapped photos of her, then aged 18, without her knowledge or consent while she slept.[126] And, again, his opinion that this instance was appropriate is irrelevant; Ms. Grand was entitled to express the view that she found this action repulsive.

Importantly, the minds of the intended recipients of Grand's letter were not blank slates ready to absorb each detail without question. Many recipients had personal knowledge of Coleman and Grand's relationship and its instability upon which to base their opinion of Grand's

---

[124] Wong October 26, 2018 text message, attached to White Decl. as Ex. FF ("you being married makes a difference (in regard to people's impression of you dealing with a lot of women" and "( [] maybe most people), as you already know, thinks that that you should not be dealing with a young women so much younger than yourself."); Coleman June 23, 2018 text message, attached to White Decl. as Ex. GG ("Of course Linda and Fabian's positions are mainly moral"); Coleman May 18, 2018 email, attached to White Decl. as Ex. HH ("they fucked up with this, so they are blaming me, partly out of embarrassment partly on moral grounds."); Anthony Dean-Harris Nov. 7, 2018 email, attached to White Decl. as Ex. II at p. 2. ("I personally feel that even though this may have been a consensual relationship, the age and power disparity between the two of them (particularly Grand's *very* young age at the start of it when he reportedly pursued her) lends itself to impropriety that I cannot personally abide by as well as the notion that a 62 year old man who received an irrevocable grant in excess of a half million dollars suing a 26-year-old women…for a half million dollars.").
[125] *See* Ex. F at 17.
[126] Ex. C; Ex. F at 17 (lacking any dispute with Ms. Grand's description that, in the summer of 2010, "The next morning I woke up to him telling me he had taken photos of me while I was asleep. He showed me the photos. I was creeped out[.]").

account.[127] It was, in fact, Mr. Coleman's actions that introduced the Parties' dispute to a far-reaching audience including people who were unaware of any of the allegations in this suit.

## C. Grand's Letter Is Not Capable of a Defamatory Meaning, Let Alone Libel *Per Se*

"[T]he court must decide whether the statements, considered in the context of the entire publication, are "reasonably susceptible of a defamatory connotation," such that the issue is worthy of submission to a jury." *Stepanov v. Dow Jones & Co, Inc..*, 120 A.D.3d 28, 34, 987 N.Y.S.2d 37, 42 (2014) (citation omitted). Whether particular statements are susceptible of a defamatory meaning—and therefore actionable—presents a question of law. *Yonaty v. Mincolla*, 97 A.D.3d 141, 143, 945 N.Y.S.2d 774, 776 (2012). A statement has defamatory connotations if it tends to expose a person to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or to induce an evil opinion of [a person] in the minds of right-thinking persons" *Id.* (quotations omitted).

Further, to avoid pleading and proving special damages (which Coleman fails to do, see below § D) and still succeed with is claim, Coleman must establish libel *per se*. The four established "per se" categories recognized by the Court of Appeals are "statements (i) charging [a] plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that [a] plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman" *Yonaty v. Mincolla*, 97 A.D.3d 141, 144, 945 N.Y.S.2d 774, 777 (2012). Unless, the statement fits within these, special damages must be shown. Grand's opinions do not fall within those categories and Coleman has utterly failed to show special damages.

---

[127] Ex. F at 5-11.

*1. There is no libel per se.*

a.　Grand did not accuse Coleman of a serious crime. Her letter makes clear that, when Coleman pressured her for sex, Grand was free to decline. Pressuring someone for sex or behaving in an unruly manner when it is declined is not a crime. References to subtle coercion cannot plausibly be construed as criminal. *See James v. Gannett Co.*, 40 N.Y.2d 415, 419, 353 N.E.2d 834, 837 (1976) (references to belly dancer's audience of men were not fairly read to imply prostitution). If there are any statements that can be construed as approaching criminal under the current understanding of consent and harassment, the facts and events are not in dispute. Recall: (1) where Coleman took pictures of her while she was sleeping and (2) she woke up to him on top of her and kissing her. About the former, Coleman states that Ms. Grand consented to the pictures because she "asked" to sleep in his room.  About the latter, Coleman states that it was not harassment because "[s]he said no and I immediately stopped and left."[128]

b.　Grand did not accuse Coleman in a manner that would tend to injure him in his musical profession. To qualify, statements must allege a link between a particular profession and a particular disreputable vice of that profession. The words must "tend to injure ... in [the professional] capacity." *November v. Time Inc.*, 13 N.Y.2d 175, 178, 244 N.Y.S.2d 309, 194 N.E.2d 126, 128 (1963); *see also Bowes v. Magna Concepts, Inc.*, 166 A.D.2d 347, 349, 561 N.Y.S.2d 16 (1st Dep't 1990) (same).

The accusation that Coleman is sexually manipulative of Grand is not linked in any way to Coleman's profession as a musician. Music aficionados do not expect their musicians to be chaste or chivalrous spouses or paramours, nor are they surprised to find out that they are womanizers.

---

[128] Ex. F at 17.

The accusation that Coleman is sexually manipulative of Grand is like the former, not the latter. Music aficionados do not expect their musicians to be chaste or chivalrous spouses or paramours, nor are they surprised to find out that they are womanizers. Just as a debt collector's supposed sexual harassment "do not impute [his] lack of ability" as a Collector/Debtor, *Castro v. Total Home Health, Inc.*, 2004 WL 1588261, at *4 (N.D.Ill. July 9, 2004), the assertion that Coleman was motivated to promote Grand based on her willingness to sleep with him has nothing to do with his ability as a musician. *Brown v. GC Am., Inc.*, 2005 WL 3077608, at *7 (N.D. Ill. Nov. 15, 2005) (similar holding as to corporate executive); *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 454 n.2 (S.D.N.Y. 2018) (assertion of female cable news commentator's marital infidelity unrelated to her fitness as a commentator).

Tellingly, Coleman's reputation to teach music—even to very young students—remained intact after Grand sent her letter. Various high schools and universities invited him to teach workshops in 2017 and throughout 2018.[129]  The only cancellation Coleman experienced in 2018 was in December and it was at a *middle school*; even there, the organizer made clear that the cancellation was temporary and he looked forward to rescheduling once the lawsuit settled.[130]

Moreover, Coleman's audience does not even expect that his band members are chosen in blind auditions; obviously, he plays with people based on personal preference. It is hardly an expectation of fans that, in an industry widely known to flout traditional norms of sexual morality, those people are likely to be engaging in "immoral" behavior on the side. This is not a case where some standard of sexual restraint is germane to the plaintiff's employment, e.g., as a priest or supervisor in a firm that conditions employment on compliance with a sexual harassment policy. *Golub v. Enquirer/Star Grp., Inc.*, 89 N.Y.2d 1074, 1076, 681 N.E.2d 1282,

---

[129] Ex. G, Exs. 1, 2.
[130] Kucsma Dep., Sept. 24, 2019, Ex. 10, attached to White Decl. as Ex. JJ.

1283 (1997) (assertion of cancer had nothing to do with plaintiff's career as a publicist). "[S]tatements cannot be slanderous *per se* if reference to extrinsic facts is necessary to give them a defamatory import." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594–95, 483 N.E.2d 1138, 1140 (1985). Yet that is the situation here: Coleman would need to provide context to show how the letter damages him.

      c.     Nor does Grand's letter impute unchastity to a woman. Setting aside the inconvenient fact that Coleman is not a woman,[131] Coleman *agrees that he engaged in a years' long extramarital affair with Grand*. He admits that she was not his first extramarital affair and that she is not his last. Mr. Coleman is currently dating a 24 year old woman, whom he began dating when she was 21 and he was 59. The chastity ship has long since sailed. Coleman is asking that this potentially moribund *per se* category be *extended* to cover allegations that a conceded adulterer is, to boot, manipulative and otherwise "not a good person" as Grand claims. No court appears to have thought of that idea, and this one should not be the first.

      d.     Grand did not represent that Coleman has a loathsome disease and Coleman does not contend that she did.

### 2. *There Is No Libel at All, and Coleman Is Libel Proof on This Topic*

      The disputed assertions are not capable of a defamatory meaning at all. It is not enough that the statement be "unpleasant or offensive; the language must make the plaintiff appear odious, infamous or ridiculous." *Franklin v. Pepco Holdings, Inc.*, 875 F. Supp. 2d 66, 74

---

[131] Although lower New York courts have found this category to reach accusations of adultery by men, *see Rejent v. Liberation Publications, Inc.*, 197 A.D.2d 240, 244–45, 611 N.Y.S.2d 866 (1st Dep't 1994), it "does not appear that the New York Court of Appeals has considered the issue." *Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*, 585 F. Supp. 2d 520, 550 (S.D.N.Y. 2008). The reasoning for the extension, that applying the category solely to women may be unconstitutional gender discrimination, ignores that the category might best be eliminated as to *both* sexes, since only in some segments of American culture is sexual promiscuity considered taboo. Arguably, all plaintiffs must show special damages resulting from such allegations.

(D.D.C. 2012). There is nothing about the context of the communication that establishes libel per quod where libel per se does not lie. It is no surprise to music fans that music stars flaunt traditional notions of sexual morality (as Coleman concedes he does) and no surprise that, in the process, their relationships—especially those with far younger love interests—become tumultuous and negative (as Coleman concedes his was). There is no evidence that anyone *not already offended* by Mr. Coleman's adultery with a student was offended at his more-difficult-to-define offense of being a bad paramour. Ultimately, Grand's conclusion was that Coleman was "not…a good person." This, at most, relates to a "general reflection upon the plaintiff's character or qualities," not "a matter of significance and importance" and is not a "defamation of a kind incompatible with the proper conduct of * * * [her] business." *Aronson v. Wiersma*, 65 N.Y.2d 592, 594, 483 N.E.2d 1138, 1140 (1985).

Moreover, Grand's letter, however unpleasant, does not make Coleman look any more odious or infamous than he already concedes he is. Courts "have recognized that a plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by allegedly false statements on that subject." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir. 1986). "It has also been recognized that a plaintiff may have had his reputation so badly damaged by true statements in a particular publication that minor false accusations within the same publication cannot result in further meaningful injury." *Id.*

Here, Coleman agrees that he is much older than Grand and married and that he slept with her anyway and, worse, pursued her for sex at least on some occasions. He agrees that this sexual intercourse was, in some sense, an exchange for his providing Grand opportunities in the music field, and his insistence that Ms. Grand, a 17-year-old, concocted that idea hardly makes him look better in the public eye than Grand's assertion that, for the most part, he pressured her.

The very dispute is Coleman's publicity problem.[132] Coleman fails to grasp that the very nature of the relationship—the adultery, age gap, power differential, and combination of sexual and professional relationships—and this lawsuit make him look as bad in the public eye as Grand is capable of making him look (where, again, she makes no allegation of criminal conduct). Her assertions and characterizations about Coleman's motive are really beside the point.[133]

Indeed, Coleman makes no effort to hide his many infidelities from his musical colleagues and fans. People who learned of Grand's account of the relationship (from Mr. Coleman's letter or social media posts) were not surprised. Readers wrote, for example: (i) "Steve Coleman, yea, sadly that makes perfect sense.";[134] (ii) "I know enough about Steve Coleman to know every word of it is true.";[135] (iii) "It's also common knowledge (in my musical circle) that Steve is a womanizer.";[136] and (iv) "I thought his pattern of behavior was somewhat well known?".[137]

### D.     Coleman Suffered No Damages, Special or Otherwise

*1.  No Special Damages Can Be Proven*

Where, as here, there is no libel per se, special damages are required to be pleaded and proven. *Lyons v. New Am. Library, Inc.*, 78 A.D.2d 723, 724, 432 N.Y.S.2d 536, 537 (1980). For

---

[132] Ex. Z ("Since I was totally unaware of this I'd say his lawsuit is doing far more damage to his reputation than she. […] Yep. Amazing what an oversized ego can do.  And he doesn't even realize he's [expletive] himself."), available at https://twitter.com/AbstractTruth/status/1054389497339748353.

[133] The fact pattern here resembles *Douglass v. Hustler Magazine, Inc.*, 769 F.2d 1128, 1135 (7th Cir. 1985), where the plaintiff agreed to pose nude for *Playboy*, and the magazine *Hustler* ended up publishing some of the resulting photos. Even while agreeing that *Hustler* is a more despicable publication than *Playboy*, *see id.* at 1135–38, the Seventh Circuit found that a libel claim would be untenable, *id.* at 1135, since the implication that she was willing to pose for *Hustler*, though false, was not defamatory under the circumstance that she *was* willing to pose nude for *Playboy*. The court drew a difference between "degrading" assertions and "defamatory" assertions in finding that no libel claim could be asserted. Here, the assertions that Coleman is manipulative and emotionally abusive are, at most, degrading, not defamatory, where he has already checked the boxes of infidelity and flirting with, and then sleeping with, a student 36 years younger than himself.

[134] Daniel Wallace Facebook post, attached to White Decl. as Ex. KK.

[135] Savino Palumbo Facebook post, attached to White Decl. as Ex. LL.

[136] Julian Brezon Facebook post, attached to White Decl. as Ex. MM.

[137] Michael Foster Facebook post, attached to White Decl. as Ex. NN.

special damages, a plaintiff must claim a "loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (internal quotation marks omitted). Special damages "must be fully and accurately stated, with sufficient particularity to identify actual losses." *Krzesaj v. New York City Dep't of Educ.*, No. 16 CIV. 2926 (ER), 2017 WL 1031278, at *14 (S.D.N.Y. Mar. 15, 2017). "The particularity requirement is strictly applied, as courts will dismiss defamation claims for failure to allege special damages with the requisite degree of specificity." *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 330 (S.D.N.Y. 2010).

The complaint fails, asserting only generic categories of damage. *See Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 337 (E.D.N.Y. 2009) (dismissing complaint for identical failure).

Coleman alleges that damage to his career began in November 2017 but even his damages expert concedes that she did not calculate any damages in her report prior to November 2018.[138] Moreover, the evidence shows that Mr. Coleman's performance and workshop schedule was robust throughout 2018, that he received unbridled media acclaim throughout the year and into January 2019, and that he worked more and was paid more in 2018 than in 2017. *See* supra §II. Correspondence from his manager shows that audiences at his performances remained unchanged.[139] In mid-2018 to late 2018, Mr. Coleman was, in fact, "refusing" work and antagonizing venues.[140]

---

[138] Ex. JJ at 40:12-16.
[139] Wong November 14, 2018 text message ("I can explain to Joon that you have been doing gigs throughout the whole time that has been "in the news" and so far, the audience has been normal."), attached to White Decl. as Ex. OO.
[140] Coleman May 23, 2018 text messages ("it looks like I'm not going tonne [sic] doing anything at the Kimmel anymore…I'm refusing to do it, because it ridiculous" and "I prefer to just cancel on Kimmel…I just won't work there…it's my choice to refuse."), attached to White Decl. as Ex. PP; Coleman February 13, 2018 text message ("I'm going to use who I want to use on my Five Element gigs. If they don't dig it, then they have every right to refuse to hire me."), attached to White Decl. as Ex. QQ; Coleman November 15, 2018 email (regarding the middle

His primary damages is estimated future earnings, but "[l]ost income does not qualify as special damages." *Vasarhelyi v. New Sch. for Soc. Research*, 230 A.D.2d 658, 660, 646 N.Y.S.2d 795, 796 (1996); *Aronson v. Wiersma*, 65 N.Y.2d 592, 595, 483 N.E.2d 1138, 1140 (1985); *Larson v. Albany Med. Ctr.*, 252 A.D.2d 936, 939, 676 N.Y.S.2d 293, 296 (1998); *Talbot v. Johnson Newspaper Corp.*, 124 A.D.2d 284, 286, 508 N.Y.S.2d 80, 83 (1986). Even if lost income qualified, Coleman's expert assumes that his career is so thoroughly destroyed that he will not earn a single dollar for the remainder of his life even though he has continued to earn money since the date Ms. Grand sent her letter. It is noteworthy that Coleman cut both his April 18th deposition short because he had to perform that evening, and admitted in his April 26th deposition that he was leaving immediately to make a gig.[141] Coleman Apr. 26 Dep. at 255:2-3 And, as Coleman himself has said, it is unlikely that industry backlash, if there is any, will continue forever.[142]

Nor does Coleman's claim for attorney fees qualify. *Tourge v. City of Albany*, 285 A.D.2d 785, 786, 727 N.Y.S.2d 753, 755 (2001) (legal fees are not special damages in defamation case); *Howard v. Block*, 90 A.D.2d 455, 455, 454 N.Y.S.2d 718, 719 (1982) (legal fees are not special damages). *Nolan v. State*, 158 A.D.3d 186, 191, 69 N.Y.S.3d 277, 281 (N.Y. App. Div. 2018).

Nor are Coleman's damages costs of therapy and messages "economic or pecuniary loss," *Galasso v. Saltzman*, 42 A.D.3d 310, 311, 839 N.Y.S.2d 731, 732 (2007), but "[m]ental distress" which, "even though resulting in physical illness, is not sufficient to make the

---

school gig that was eventually uncancelled, "Personally I don't even want to come back to your school, or Cal Arts, even after it is proven that Maria is lying, if your principle and the Cal Arts people are going to be this close minded. And you can pass this email on to them"), attached to White Decl. as Ex. RR.
[141] Ex. G at 255:2-3.
[142] Coleman October 24, 2018 text message, attached to White Decl. as Ex. SS, ("people have short-ass attention spans these days, but it will be a rough ride for a while. I just have to deal with it.").

defamation actionable." Restatement (Second) of Torts § 575 (1977); *Rall v. Hellman*, 284

A.D.2d 113, 114, 726 N.Y.S.2d 629, 632 (2001) (emotional distress does not qualify as special

damages); cf. *Sharratt v. Hickey*, 20 A.D.3d 734, 736, 799 N.Y.S.2d 299, 301 (2005) ("Although

there was testimony that after the report was published plaintiff Dwaine R. Sharratt suffered

depression which required medication, no medical proof linked the depression to the report and

its repercussions. Causation must be proven, especially in light of Dwaine Sharratt's past

medical history.").

Furthermore, the statement of damages is too vague to qualify; they must be itemized at a

granular level. "[R]ound figures or a general allegation of a dollar amount ... will not suffice."

*Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 330, 336 (S.D.N.Y. 2010); *Nunez v. A-T Fin. Info.

Inc.*, 957 F. Supp. 438, 441 (S.D.N.Y. 1997). Plaintiff's rough estimates are insufficient.

### 2. *No General Damages Can Be Proven, and Nominal Damages Fail to Satisfy the Amount-in-Controversy Requirement*

Although libel per se proceeds as a cause of action without a showing of damages,

damages must still be proven, or else nominal damages of $1 are required. *Meehan v. Snow*, 494

F.Supp. 690, 695 (S.D.N.Y.1980), rev'd on other grounds, 652 F.2d 274 (2d Cir.1981). § 1:55.

Defamation—Damages, 14 N.Y.Prac., New York Law of Torts § 1:55. "Since the plaintiff failed

to establish actual damages, her award of damages for slander per se should be limited to

nominal damages of one dollar." *Orlowski v. Koroleski*, 234 A.D.2d 436, 437, 651 N.Y.S.2d

137, 138 (1996) (order after trial).

No matter the outcome of this litigation, New York's defamation statute carries with it no

provision to recover attorney's fees; attorney fees are not damages, even in cases of libel per se.

*Orlowski v. Koroleski*, 234 A.D.2d 436, 437, 651 N.Y.S.2d 137, 137 (1996). Coleman will never

be entitled to recover attorney's fees, no matter how he characterizes them. In addition to being

legally improper, an award for legal costs would be unjust because a significant portion those fees was the direct result of Coleman's own failure to abide by the Federal and local rules.[143]

### E. Plaintiff Cannot Show Causation

Even if Coleman had suffered damages, he has only himself to blame. Grand sent her letter to 38 recipients chosen because they were already aware of her troubled relationship with Coleman. Coleman, by contrast, published Grand's letter to the world by filing this lawsuit. He also testified that he spoke of Grand's letter to many others, and his response letter was directed to 80 recipients. It was the *republication* by Coleman, not Grand's publication, that brought Grand's statements to the public eye and, as a result, caused any resulting harm.

New York's "republication liability standard has been consistent for more than one hundred years." *Geraci v. Probst*, 15 N.Y.3d 336, 342, 938 N.E.2d 917, 921 (2010). "It is too well settled to be now questioned that one who utters a slander, or prints and publishes a libel, is not responsible for its voluntary and unjustifiable repetition, without his authority or request, by others over whom he has no control and who thereby make themselves liable to the person injured." *Schoepflin v. Coffey*, 162 N.Y. 12, 17, 56 N.E. 502, 504 (1900); *see also Geraci*, 15 N.Y.3d at 342 (quoting same); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) (same).

---

[143] Coleman's bad behavior in prosecuting this case has caused the Parties to engage in at least six unnecessary motion practices. On March 21, Coleman's pursuit of improper discovery forced Grand to file a motion for the Protective Order. The Court granted the order. (ECF. Nos. 30-35, 40, 42-43). On April 5, Coleman filed unsealed nude photographs of Ms. Grand on the docket, forcing an emergency motion practice to protect Ms. Grand. (ECF Nos. 36-39, and 41). In May, Coleman refused to inform third parties from whom he sought discovery about the Protective Order. Grand was forced to again move to protect herself from improper discovery. The Court agreed. (ECF Nos. 48-50). After refusing to negotiate search terms, on June 14, Coleman filed a motion accusing Grand of withholding discovery. The Court denied. (ECF Nos. 50-56). On July 12, Coleman failed to timely disclose his expert report and, after the fact, requested the grace of the Court to excuse his disregard for the Court's scheduling order. (ECF Nos. 57-60). On August 2, Coleman disclosed that he provided documents to his expert that he refused to produce in discovery. Grand was forced to file a motion to address this. The Court agreed that the documents were improperly withheld and compelled Coleman to produce additional discovery. (ECF Nos. 75, 77, 79).

Here, it was not a "third party" but Coleman himself who republished Ms. Grand's letter and cause whatever harm he can show, and that only *further* cuts against liability. "New York does not recognize defamation via compelled self-publication," let alone the entirely gratuitous republication Coleman has accomplished. *See Phillip v. Sterling Home Care, Inc.*, 103 A.D.3d 786, 787, 959 N.Y.S.2d 546, 548 (2013)); *Wieder v. Chem. Bank*, 202 A.D.2d 168, 170, 608 N.Y.S.2d 195, 196 (1994) (same); *Caesars Entm't Operating Co. v. Appaloosa Inv. L.P. I*, 48 Misc. 3d 1212(A), 18 N.Y.S.3d 577 (N.Y. Sup. Ct. 2015) (same).[144] Coleman therefore must tie any harm to Ms. Grand's letter, not to his lawsuit or other republications of, or statements about, her letter. *See Dagel v. Lemcke*, 245 Ga. App. 243, 244, 537 S.E.2d 694, 696 (2000) (dismissing case where damages were the result of the plaintiff's suing the defendant, not the defendant's speech). What's more, it was *Coleman* who went on the media circuit, giving statements to the New York Daily News and other publications, and antagonizing anyone who commented negatively on the public social media discussion that *he started*.[145] Grand has been silent, but for one statement refusing to comment.

Thus, to establish causation Coleman would have to prove that Grand "had authority or control over, or somehow ratified or approved, the republication" *by Coleman*. *Cerasani v. Sony Corp.*, 991 F. Supp. 343, 351 (S.D.N.Y. 1998). That, of course, is impossible.

---

[144] In any event, no compulsion was "reasonably foreseeable," as Ms. Grand's letter caused no harm and was reasonably calculated to ensure minimal exposure. *Cweklinsky v. Mobil Chem. Co.*, 364 F.3d 68, 73 (2d Cir. 2004).
[145] Coleman Facebook reply, attached to White Decl. as Ex. TT ("it's obvious you know nothing about this dispute, and don't care to know. Otherwise you would wait for the facts to come out before you prejudged. #moralpolice:"); Coleman Facebook reply, attached to White Decl. as Ex. UU ("No, Chris. Please read my complaint and do a little math."); Coleman October 24, 2018 Facebook reply, attached to White Decl. as Ex. VV ("Your reckless comments are getting more and more ridiculous."); Coleman Twitter reply, Ex. WW ("Read more carefully next time before you comment.")

### F. Any Damages Are Insufficient To Satisfy the Amount-in-Controversy Requirement

At best, Coleman is entitled to nominal damages, and his failure to plead special damages or causation casts even that in substantial doubt.[146] But, because nominal damages do not satisfy the $75,000 jurisdictional requirement, Coleman cannot proceed to collect nominal damages in federal court. *Alston v. Flagstar Bank, FSB*, 609 F. App'x 2, 4 (D.C. Cir. 2015); *Indiana Hi–Rail Corp. v. Decatur Junction Ry. Co.*, 37 F.3d 363, 366 (7th Cir.1994) (holding that where the plaintiff is only entitled to nominal damages under state law, "it is a legal certainty that [the plaintiff] could not recover the jurisdictional amount").

### G. Plaintiff Cannot Meet Any Standard of Fault

*1. A Heightened Actual-Malice or Gross-Irresponsibility Standard Applies*

A heightened standard applies to this case for three reasons.

First, Mr. Coleman is a sufficiently well-known musician to be a public figure "for all purposes." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 94 S. Ct. 2997, 3009, 41 L. Ed. 2d 789 (1974). See *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (applying NY and federal constitutional law and finding "no question" that a famous musician was a public figure); *Man v. Warner Bros. Inc.*, 317 F. Supp. 50, 53 (S.D.N.Y. 1970) (famous musician was a public figure). *Koussevitzky v. Allen, Towne & Heath, Inc.*, 188 Misc. 479, 483, 68 N.Y.S.2d 779, 783 (Sup. Ct. 1947), aff'd, 272 A.D. 759, 69 N.Y.S.2d 432 (App. Div. 1947) ("The plaintiff in this case during the greater part of his life has been and continues to be an important public figure. His prominent achievements as a musician bring him constantly before the public eye and

---

[146] Coleman's claim for punitive damages fails both under the standard of showing "outrageous conduct" and "hatred, ill will, spite, criminal mental state or that traditionally required variety of common-law malice." *DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005) (quoting New York state law). Coleman fails to show even the constitutional actual malice prerequisite, and Grand's careful avoidance of even naming Coleman establishes that he cannot meet this exceedingly high standard. *See Prozeralik v. Capital Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 480, 626 N.E.2d 34, 42 (1993).

make his life of general interest."); *Time Inc. v. Sand Creek Partners, L.P.*, 825 F. Supp. 210, 213 (S.D. Ind. 1993) (well-known musician and actress bride were public figures); *Roche v. Mulvihill*, 214 A.D.2d 376, 625 N.Y.S.2d 169, 170 (1st Dep't 1995) (plaintiff, "a well known Irish comedian," was "indisputably" a public figure); *James v. Gannett Co.*, 40 N.Y.2d 415, 421, 353 N.E.2d 834, 839 (1976) (belly dancer in Rochester was a public figure); *Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind. App. 548, 372 N.E.2d 1211, 1219 (2d Dist. 1978) (plaintiff, former Playboy Playmate and Miss Hurst Golden Shifter of the Indianapolis 500 car race, was a public figure). This public-figure status triggers the actual-malice standard.

Second, Grand spoke on matters of sexual impropriety and pressure in the music industry, a matter of public concern. *Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 977 (3d Cir. 1997) (sexual harassment issue of public concern for purposes of *Connick/Pickering* test). *Huggins v. Moore*, 94 N.Y.2d 296, 302, 726 N.E.2d 456, 459 (1999). The rule applies independently as a matter of New York law. *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 199, 341 N.E.2d 569, 571 (1975); *Hayt v. Newsday, LLC*, No. 2018-00361, 2019 WL 5057864, at *1 (N.Y. App. Div. Oct. 9, 2019). This triggers a requirement that Coleman show that Grand "acted in a grossly irresponsible manner." *Huggins*, 94 N.Y.2d at 302, 726 N.E.2d at 459 (quotation marks omitted).

Third, Grand spoke pursuant to a common-interest privilege. A "communication made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contained criminating matter which, without this privilege, would be slanderous and actionable; and this though the duty be not a legal one, but only a moral or social duty of imperfect obligation' " *Anas v. Brown*, 269 A.D.2d 761, 762, 702 N.Y.S.2d 732, 733–34

(2000) (quoting cases). Common interest privilege is a qualified privilege, and qualified privileges are broadly applied. The Parties need only have such a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information. *Id.*; *see Liberman v. Gelstein*, 80 N.Y.2d 429, 437, 605 N.E.2d 344, 349 (1992) (flexible reach in a variety of contexts).

Here, Grand limited her communication to about 38 individuals in the music industry who she understood to be concerned about the plight of women in what is often a highly sexualized and often abusive process of gaining a career foothold.[147] This is a matter, not only of public concern, but of unique concern to the individuals who received Grand's letter, since they were all *personally* tied to the industry. Grand sent the letter because she wanted to start a "larger conversation about what's acceptable and what's not" in the music industry, and in order for "awareness to be raised."[148] Grand selected the letter's recipients because she believed their voice counted, and what they thought mattered, in the music community.[149] Grand's letter represents her story, not so much to single out Coleman, but to describe an industry trend applicable to many persons. In fact, Grand is a member of a group called "We Have a Voice Collective" that sought to raise awareness of these issues and press for reform. As noted, the communication was tailored to reach individuals interested in the issue and Grand expressly asked to be informed of any effort to forward the communication.

### 2. *Plaintiff Cannot Satisfy the Actual Malice Standard*

The standard is actual malice, meaning knowledge that the statement was false or reckless disregard for whether it was false. *Liberman*, 80 N.Y.2d at 437–38. There is no triable

---

[147] *See* Ex. B.
[148] Ex. B.
[149] *Id.*

issue under this standard. "The element of actual malice in a defamation claim focuses primarily on what a defendant knew or believed at the time a purportedly false statement was made." *Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 453 (S.D.N.Y. 2018). Grand wrote her letter from personal experience about a relationship she experienced firsthand and which she found to be, by and large, negative. Coleman cannot possibly show actual malice—a high burden as to which he bears the burden—where he has no way to prove that Grand did not sincerely view Coleman as manipulative and abusive. Coleman responds with assertions that "suggestion nothing more than the whimsical ups and downs of a scorned lover" and has offered no evidence to meet his heavy burden. *Id.*

Colemans's claim fares even worse than the one rejected in *Hughes*, which dismissed a defamation claim based on the assertion that the defendant lied about a sexual incident that the plaintiff asserted was an act of rape. Because there was no evidence that the defendant was subjectively aware of the lack of consent in the relationship, the plaintiff failed to prove actual malice. By comparison, Grand did not allege rape, and Coleman cannot possibly prove that, even if he viewed his behavior towards Grand as proper, she lacked a reasonable basis to view Coleman as manipulative and abusive.

## V. CONCLUSION

Mr. Coleman's litigation is misguided because he seeks to punish protected opinion, and baseless because it finds no foundation in governing law. He may not like Ms. Grand's opinions about their relationship gone wrong, but he is not entitled to a judgment condemning her for sharing them. His inability to show any damage related to Ms. Grand sending her letter tells us something we already knew: he was not defamed. Summary judgment should be granted in Ms. Grand's favor on Mr. Coleman's claims.

Dated: October 24, 2019

/s/ A. Mackenna White

A. Mackenna White
Email: mackenna.white@lbkmlaw.com
Lewis Baach Kaufmann Middlemiss PLLC
405 Lexington Avenue, 62nd Floor
New York, NY 10174

Mark I. Bailen
Email: mbailen@bakerlaw.com
Katherine L. McKnight
Email: kmcknight@bakerlaw.com
BAKER & HOSTETLER LLP
1050 Connecticut Avenue NW
Washington D.C. 200036
Telephone: (202) 861-1500
Facsimile: (202) 861-1783

Cara McGourty
Email: cmcgourty@bakerlaw.com
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111


*Attorneys for Defendant*