**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STEVEN DOUGLAS COLEMAN,

              Plaintiff,

v.

MARÍA KIM GRAND,

              Defendant.

Case No. 1:18-cv-05663 (JBW) (RLM)

**DEFENDANT'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I. Introduction ............................................................................................................1

II. Facts Provable at Trial ..........................................................................................3

    A. The Relationship Begins .................................................................................3

    B. The Relationship Grows Tumultuous and Ends .............................................7

III. Standard on Motion for Summary Judgment ......................................................11

IV. Argument .............................................................................................................12

    A. Plaintiff's Defamation Claim Fails as a Matter of Law. ...............................12

        1. Coleman Must Identify A Statement That Is Defamatory and False, He Does Not........................................................................................14

            a. "About six months after I moved to NY in 2011, he convinced me to be intimate with him."..........................................................14

            b. I was sexually harassed inside of a professional relationship........16

            c. By that point, though [Sept. 2013], I wasn't in love with him anymore. I didn't want to be intimate anymore. That period is when the sexual harassment started." ............................................19

            d. "He would call me in the middle of the night and never take no for an answer."........................................................................20

            e. The Letter Taken as a Whole. .......................................................20

        2. Coleman Identifies No Defamation *Per Se* or Special Damages.............22

        3. Coleman Has Not and Cannot Demonstrate the Requisite Fault.............26

    B. Grand's Counterclaims Survive as a Matter of Law...............................27

        1. Grand Can Show Defamation. ..............................................................28

        2. Grand Can Show Intentional Infliction of Emotional Distress.................31

V. Conclusion ...........................................................................................................33

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amadsau v. Bronx Lebanon Hosp. Ctr.*,
2005 WL 121746 (S.D.N.Y. Jan. 21, 2005), report and recommendation
adopted 2005 WL 954916 (S.D.N.Y. Apr. 26, 2005), aff'd, 225 F. App'x 32
(2d Cir. 2007)................................................................................................................26

*Armstrong v. Simon & Schuster, Inc.*,
85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d 825 (1995)..................................................29

*Aronson v. Wiersma*,
65 N.Y.2d 592, 483 N.E.2d 1138 (1985).................................................................24

*Belvision Inc. v. M & G Elecs., Inc.*,
134 A.D.2d 313, 520 N.Y.S.2d 790 (1987) ...........................................................21

*Bonner v. Guccione*,
916 F. Supp. 271 (S.D.N.Y. 1996)........................................................................31

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1998)................................................................................................17

*Castro v. Total Home Health, Inc.*,
2004 WL 1588261 (N.D.Ill. July 9, 2004).............................................................23

*Celle v. Filipino Reporter Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000)........................................................................... *passim*

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................12

*Collins v. Willcox Inc.*,
600 N.Y.S.2d 884 (Sup. Ct. 1992).........................................................................31

*Drug Research Corp. v. Curtis Pub. Co.*,
7 N.Y.2d 435, 166 N.E.2d 319 (1960)..............................................................14, 15

*Four Star Stage Lighting, Inc. v. Merrick*,
56 A.D.2d 767, 392 N.Y.S.2d 297 (1977) ............................................................29

*Herlihy v. Metro. Museum of Art*,
214 A.D.2d 250, 633 N.Y.S.2d 106 (1995) ..........................................................30

*Hughs v. Twenty-First Century Fox, Inc.*,
304 F. Supp. 3d 429 (S.D.N.Y. 2018)...................................................................26

*Jackson v. NYS Dep't of Labor,*
    2012 WL 843631 (S.D.N.Y. Mar. 12, 2012) ........................................................17

*Kasavana v. Vela,*
    172 A.D.3d 1042, 100 N.Y.S.3d 82 (N.Y. App. Div. 2019) ...................................29

*Kforce, Inc. v. Alden Pers., Inc.,*
    288 F. Supp. 2d 513 (S.D.N.Y. 2003)..............................................................23, 24

*Kowalski v. Greski,*
    2009 WL 1218666 (Conn. Super. Ct. Apr. 9, 2009).............................................30

*Levin v. McPhee,*
    119 F.3d 189 (2d Cir. 1997)................................................................................16

*Loewinthan v. Beth David Hosp.,*
    9 N.Y.S.2d 367 (Sup. Ct. 1938).........................................................................29

*Majer v. Metro. Trans. Auth.,*
    No. 90 CIV. 4608(LLS), 1990 WL 212928 (S.D.N.Y. Dec. 14, 1990)..................21

*McCarthy v. Am. Int'l Grp., Inc.,*
    283 F.3d 121 (2d Cir. 2002)...........................................................................11, 12

*Medcalf v. Walsh,*
    938 F. Supp. 2d 478 (S.D.N.Y. 2013)................................................................27

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990)...............................................................................................13

*Mirage Entm't, Inc. v. FEG Entretenimientos S.A.,*
    326 F. Supp. 3d 26 (S.D.N.Y. 2018)..................................................................16

*Muzikowski v. Paramount Pictures Corp.,*
    2003 WL 22872117 (N.D. Ill. Dec. 3, 2003).......................................................30

*Nunez v. A-T Fin. Info. Inc.,*
    957 F. Supp. 438 (S.D.N.Y. 1997).....................................................................24

*O'Reilly v. Executone of Albany, Inc.,*
    121 A.D.2d 772 (3d Dep't. 1986)......................................................................32

*Polley v. Fed. Reserve Bank of NY,*
    1994 WL 465923 (S.D.N.Y. Aug. 23, 1994).......................................................32

*Rojas v. Splendor Landscape Designs Ltd.,*
    268 F.Supp.3d 405 (E.D.N.Y. 2017) ..................................................................12

*Thorsen v. Sons of Norway,*
    996 F. Supp. 2d 143 (E.D.N.Y. 2014) ...................................................................19

*Workman v. Kroger Ltd. P'ship I,*
    2007 WL 2984698 (S.D.W. Va. Oct. 11, 2007) ......................................................30

*Yonaty v. Mincolla,*
    97 A.D.3d 141 N.Y.S.2d 774 (2012) ....................................................................23

*Zervos v. Trump,*
    171 A.D.3d 110 (N.Y. App. 2019) .......................................................................28

**Other Authorities**

George W. Pring, SLAPPs: Strategic Lawsuits Against Public Participation, 7
    PACE ENVTL. L. REV. 3, 3, 9–11 (1989) ..............................................................26

W. Page Keeton, et al., Prosser and Keeton on Torts § 112, 792–93 (5th ed. 1984).....................29

# I.  **INTRODUCTION**

Plaintiff Steve Coleman's ("Coleman") motion for summary judgment ("Motion") is legally and factually baseless. In Coleman's own words, he sued Defendant María Grand ("Grand") because she wrote a letter[1] ("Letter") asserting that "Coleman didn't behave to her liking during their consensual six-year relationship." The Motion only proves why summary judgment should be entered *against* Coleman: it is not defamatory to assert that someone does not behave to one's "liking," and Grand's view is pure, protected opinion. Coleman's inability to identify a single defamatory assertion alone defeats his claim. His claims fails a second time because he establishes no damage traceable to Grand's Letter and a third because he cannot show that Grand acted with any degree of fault.

Coleman's claim fails again because he does not identify any material fact omitted from the letter he calls false and defamatory. Grand's Letter disclosed that "at times" she was "hooked" on Coleman, was in "love" with him, and initiated some aspects of the relationship. She also disclosed her feelings that there were "times" that Coleman sexually harassed her. Coleman's references to text messages merely identify these facts at a granular level—and on a highly selective basis. His apparent wish that she had characterized things differently is neither interesting nor relevant. Grand cannot be wrong in her characterizations because they are her opinion which cannot be proven false. To the extent the Letter does contain verifiable facts, they are true in every material respect. For these reasons and others, Coleman's claim should be resolved now in Grand's favor.

But, regardless of how the Court rules on Grand's motion, Coleman certainly cannot win on summary judgment as a plaintiff. He has failed to cite even a single example of a court

---

[1] The Letter is attached to (ECF No. 87, Ex. A) and summarized in Grand's memorandum of law in support of her motion for summary judgment (*see* ECF No. 86, at 6–9).

granting summary judgment in favor of a plaintiff who is a public figure and defense counsel is not aware of any. There are, however, thousands of examples of courts granting summary judgment for defendants in such cases, supporting all the more that summary judgment here should be granted in Grand's favor.

Because he has failed to establish any special damages, Coleman's claim inherently rests on his claim for defamation *per se* alleging damage to his reputation for "sexual morality" and "professionalism." Coleman is libel proof on both. He freely admits to being an adulterer and, in his words, "I have no shame" because infidelity is a part of "my basic moral views." He has had other public affairs with female musicians decades his junior with whom he worked or mentored, and is currently having one. Coleman's Motion colors this further in arguing that the behavior that Grand complained of is "so pervasive in society…that it cannot rise to the level of 'outrageous.'" Though he purports not to "condone" this behavior, his position of what is and is not acceptable is clear and it does not land anywhere on the scale of sexually moral. These points alone should end any argument he can proffer on that topic.

Coleman also ignores a mountain of evidence supporting, in full, Grand's statements in the Letter. For example, in a September 2015 email that Coleman sent Grand while she was touring with his ensemble and refused to sleep with him, Coleman stated, "[y]ou know what I want, don't pretend," and demanded that Grand "tak[e] care of me the moment we arrive at the hotel in Paris without delays, arguments or debates." He acknowledged that she did not want to sleep with him, but his needs come first, and he was getting nothing "but the bluest balls humanly possible." At another time, when Grand inquired about a mentoring opportunity, Coleman responded, "I'm sure you don't want to hear this," but asserting anyway, "I had a very nice erotic dream about you today." In July 2012, Coleman wrote Grand noting that he was

planning to take her with him to meet a famous jazz musician but "wanted to wait" before extending the invite until she slept with him and describing, explicitly, the sexual acts he expected. The evidence disproves any falsity in the overall meaning of Grand's Letter: that she felt she was "being coerced and being pressured into having sex" and "sexually harassed inside of a professional relationship."

Coleman's effort to litigate the meaning of texts one-by-one illustrates why his case is misguided, why he is not entitled to summary judgment, and why Grand is. The evidence he cites—which is ambiguous and open to interpretation—in no way suggests that Grand's Letter was false. If anything, they prove that it is true. Grand's limited assertion that there were "*times* where [she] was sexually harassed," so references to times where she was *not*, which is his entire argument. What's more, Coleman's claim depends on the non-sequitur that, if Grand *sometimes* wanted an intimate relationship with Coleman, then he was *always* entitled to demand that relationship, and sexual harassment was *never* possible. Coleman's conclusion is wrong.

For these reasons, and those discussed below, Coleman's Motion should be denied for failure to meet even one element of a defamation claim. Grand's should be granted.

## II.     FACTS PROVABLE AT TRIAL

Because Coleman is the movant here, all facts and inferences must be taken in favor of Grand. Thus, the following facts must be taken as true.

### A.      The Relationship Begins

María Grand was born in Switzerland in 1992. She grew up in a household that valued music. Her father played the saxophone and frequently played Steve Coleman's records for her. Following in her father's footsteps, Grand took saxophone lessons as a child.[2]

---

[2] Declaration of María Kim Grand, dated November 22, 2019, in Support of her Opposition to Plaintiff's Motion for Summary Judgment ("Grand Decl."), ¶ 4.

Grand's home life was strained and, at 15, she moved out of her parents' house to a nearby apartment.[3] Beginning her second year of high school, she attended a school "specialized for musicians."[4] She is currently in the United States on a visa for "individuals with extraordinary ability."[5]

In May 2009, one month after she turned 17 years old, Grand traveled to the United States to continue her musical studies.[6] She traveled alone and stayed with a friend.[7] During that trip, Grand learned of an upcoming improvisation workshop through an advertisement in the New York City Jazz Record, a local gazette.[8] The workshop took place at the Jazz Gallery and was taught by Coleman.[9] Coleman was a famous jazz saxophonist who has won numerous awards and accolades including a McArthur Genius Grant in 2014. He has been referred to as "one of the most important musicians in the last several decades" and the "heir" to John Coltrane and Charlie Parker.[10] By her own telling, Grand was a novice and "understood nothing."[11] By Coleman's telling, "she couldn't play at all when I first met her."[12] But she was mesmerized and, after the workshop, asked Coleman to teach her.[13] He declined.[14] "She insisted and he finally agreed" to give her lessons.[15] That was in 2009. At the time, Grand was 17. Coleman was 52.

[3] Grand Decl., ¶ 4; Grand Dep. April 17, 2019, at 9:5-9:0, attached as Exhibit A to the Declaration of Mackenna White in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment (White Decl.").
[4] Ex. A, at 12:24–13:2.
[5] Grand Decl., ¶ 5.
[6] Ex. A, at 32:13–19.
[7] Grand Decl., ¶ 6.
[8] Grand Decl., ¶ 7.
[9] Ex. A, at 31:10–16.
[10] "Despite Recognition, jazz sax player Steve Coleman finds respite in Allentown," The Morning Call, Apr. 30, 2016, available at https://www.mcall.com/entertainment/mc-steve-coleman-allentown-jazzfest-20160430-story.html, attached as Exhibit B to the White Decl.
[11] ECF No. 87, Ex. A, at 1.
[12] "Jazz iconoclast Steve Coleman on the ancient bedrock of human creativity," Chicago Reader, Aug. 4, 2015, available at https://www.chicagoreader.com/chicago/steve-coleman-interview-m-base-five-elements-synovial-geof-bradfield/Content?oid=18504926, attached as Exhibit C to the White Decl.
[13] ECF No. 87, Ex. A, at 1.
[14] Id.
[15] Id.

Grand met Coleman met four or five times at other musician's houses for lessons during her trip.[16] At their second lesson, after the musician hosting the lesson fell asleep, Coleman stated that he would like to perform oral sex on Grand: "you should just let me go down on you."[17] (Coleman admits to flirting, only not an overt reference to sex, but Grand's story, not his, counts here.) Grand was "shocked" that he would attempt to sexually engage a 17 year old.[18]

In July 2009, Grand returned to Switzerland, still apart from her family.[19] Coleman continued to communicate with Grand frequently and earned Grand's trust by continuing to give her musical and career advice. He also began to sexualize routine correspondence. For example, in an early November 2009 Skype chat, Grand commented to Coleman that her mother was criticizing her diet. Coleman responded, uninvited, "yea, me too – I'm about to go back to bed, have some sex – and then fall asleep."[20] Grand responded: "I have to go."[21] Coleman then asked her if she was leaving to go to school—high school.[22] Grand later texted Coleman that his comment "freaked me out!!!!!"[23]

Days later, he invited Grand to his performance in Belgium.[24] Though his wife was also there, he asked Grand to stay in his room. Once alone, Coleman asked Grand to give him a chest massage and became angry, calling Grand "uptight," when she declined.[25] When Coleman sensed that Grand was upset about his sexual advances, he worked to control the narrative,

---

[16] Ex. A, at 32:13–21.
[17] *Id.* at 32:2–3; Grand Decl., ¶ 9.
[18] ECF No. 87, Ex. A, at 1.
[19] Grand Decl., ¶ 10.
[20] November 7, 2009 Skype messages between Plaintiff and Defendant, attached as Exhibit D to the White Decl.
[21] *Id.*
[22] *Id.*
[23] January 22, 2010 Skype Messages between Plaintiff and Defendant, attached as Exhibit E to the White Decl.
[24] Grand Decl., ¶ 12.
[25] *Id.*

shaming Grand for misunderstanding. "I asked you for a back m[a]ssage, not for sex – there is a difference."[26] But, he admitted: "I wanted both."[27] He was 53 at the time. She was still 17.

On November 25, 2009, Coleman stated that he was "attracted to" Grand.[28] She, in response, tried to limit the relationship.[29] He responded: "I don't like relationships that have limits on them. What I mean by that is where people impose a limit on the relationship, like, 'no this' or 'no that'. I respect you[r] decision, I have no problem with it. But it[']s not really the way I relate."[30] Coleman made similar statements on other occasions, and Grand understood all of them to mean that advancing professionally with Coleman meant to reciprocating his advances.[31]

A few months later, in January 2010, Coleman sent Grand the following message on Skype: "You have no idea how much I think about you. I'm going to have to stop talking to you."[32] Grand wrote back:

> I will be honest too. I really would like you not to be attracted to
> me so much, because it doesn't make thing easy for me. I love you
> as a father, and so this is kind of weird, because you expect one
> kind of things and I expect another kind of things.[33]

Coleman responded: "OK, it[']s done!"[34]

But it was not done. While on musical study trip, Coleman snapped photographs of Grand while she slept without her consent.[35] He continued to pressure her for sex; she continued

---

[26] November 25, 2009 Skype messages between Plaintiff and Defendant, attached as Exhibit F to the White Decl.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] Grand Decl., ¶ 13.
[32] January 22, 2010 Skype Messages between Plaintiff and Defendant, attached as Exhibit G to the White Decl.
[33] *Id.*
[34] *Id.*
[35] Ex. A, at 97:2–9.

to seek his tutelage.[36] Later in 2010, Coleman told Grand that he would not speak to her because she declined to sleep with him.[37] As a result, they did not speak for an extended period.[38]

Between 2009 and 2011, when Grand repeatedly refused to engage in sex with Coleman, he told her that she was uptight, frigid, and would not advance unless she loosened up by engaging in sex with him.[39] Grand felt that he "pressured me a lot in different ways for me to have sex with him."[40] In 2011, Grand moved to the United States to pursue her dream of being a professional jazz saxophonist.[41] She was 19. Coleman was 54. Grand continued to study with him, and he began to hire her to do odd jobs, like writing out musical notation.[42] She continued to be in awe of him as a musician and was grateful for the opportunity to study with him.[43]

**B. The Relationship Grows Tumultuous and Ends**

With Coleman's training, Grand quickly progressed in her musical ability. By 2014, Grand began to tour and perform with Coleman.

About six months after Grand moved to the United States, as Grand states it, Coleman "convinced me to be intimate with him."[44] In June 2011, Grand went to Coleman's house, where "he pressured me a lot to have oral sex with me, so, finally, I agreed for him to give me oral sex."[45] But, because she did not "return the favor, he got really angry and went to his room and was angry until I let him masturbate on my leg."[46] This was the first sexual encounter, and others

---

[36] Grand Decl., ¶ 15.
[37] Ex. A, at 51:14-51:18.
[38] *Id.*
[39] Grand Decl., ¶ 15-16.
[40] Ex. A, at 34:6–7.
[41] Grand Decl., ¶ 17.
[42] *Id.*
[43] *Id.*
[44] ECF No. 87, Ex. A, at 3.
[45] Ex. A, at 35:2–5.
[46] *Id.* at 35:5–8.

were like it. In Grand's view, "this was never a normal sexual relationship."[47] But Grand has never claimed that Coleman raped her or committed any criminal act against her.

Grand believed that she gave her body to Coleman in exchange for opportunity—or, as she later wrote "I became his sort of little student mistress,"[48]—and she had good reason to think this. For example, in a January 2012 email, Coleman admitted that "I'm sure you don't want to hear this" and called her a "changeling,"[49] but went on anyway: "I had a very nice erotic dream about you today."[50] In July 2012, Coleman wrote to Grand via email stating that he planned to take her to meet the famous jazz musician Sonny Rollins, but *first* he "wanted to wait…to see how the day was going to go," which meant waiting to meet her first in bed.[51] "I tried to be very nice to you, but I guess nice means [sex]," Grand responded.[52] "Right . . . Your Guess is Absolutely Right [. . .] you are not trying hard enough," Coleman responded.[53]

Three years later, the story was no different. In January 2015, Grand texted Coleman that she preferred to travel separately to an event they were both attending.[54] Coleman preferred she come to his house first and "kill two birds with one stone" (the first stone being sex),[55] but "I already know you are just stalling me and trying your best not to be alone with me anywhere – so we might as well save time and stop now."[56] The next month, Coleman sent Grand an email mocking her new boyfriend and telling her to "*crawl back on your knees with your mouth wide*

---

[47] *Id.* at 38:4–5.
[48] ECF No. 87, Ex. A, at 3; Grand Decl., ¶ 18.
[49] January 27, 2012 emails between Plaintiff and Defendant, attached as Exhibit H to the White Decl. Coleman also frequently referred to Grand as the "changeling" and "every other day," in sardonic reference to the frequent instances where she refused to engage in sex. These terms were part of Coleman's subtle manipulation of Grand.
[50] Ex. H.
[51] ECF No. 87, Ex. I, at 1.
[52] *Id.*
[53] *Id.*
[54] January 9, 2015 emails between Plaintiff and Defendant, attached as Exhibit I to the White Decl., at 1.
[55] *Id.* at 2.
[56] *Id.* at 1.

*open*."[57] In August 2015, when Grand was on tour with Coleman and refused to engage in sex with him, and was dating someone else, he texted her: "I should've cum on ur face while u were sleep."[58] Just a few days later, Coleman complained that "I'm pissed because I told u that u could stay with me, and u ignored me."[59] Grand responded: "I don't wanna have sex with you…Because you want to have power over people, and since I didn't respond right, then you don't consider me interesting to you…I don't wanna be with you anymore." [60] He called her an "ingrate."[61]

When Grand texted Coleman that she felt that he only cared about sex and not her musical talent. Coleman wrote to her: "The work I put in to help u develop, giving u access to information, people, places, legends like Von, McCoy & Sonny, gigs, etc…I gave u a million dollars worth of private lessons…and all you talk about is some sex."[62] Later that month, when Grand complained to Coleman "I always knew that no matter how hard I work I'll always be a vagina for you."[63] Coleman wrote back: "Fuck you."[64]  His coercions were not lost on Grand and she many times complied because she "felt that [she] needed him in [her] life in order to survive, to learn, to thrive, and to become a professional musician."[65]

The record is teeming with evidence of this. In September 2015, when Grand was engaged with Coleman in a European tour but refused to engage him in bed, Coleman texted:

---

[57] ECF No. 87, Ex. J, at 1 (emphasis in original).
[58] August 1, 2015 text messages between Plaintiff and Defendant, attached as Exhibit J to the White Decl.
[59] August 8, 2015 text messages between Plaintiff and Defendant, attached as Exhibit K to the White Decl.
[60] *Id.*
[61] *Id.*
[62] August 13, 2015 text messages between Plaintiff and Defendant, attached as Exhibit L to the White Decl.
[63] *Id.*
[64] *Id.*
[65] ECF No. 87, Ex. A, at 2. Grand was not alone in believing Coleman was professionally coercive.  His own manager told him "you doing this thing where you make people feel guilty if they don't do what you ask, or tell, them to do" (April 22, 2018 email from Sophia Wong to Plaintiff, attached hereto as Exhibit M to the White Decl.) and his own wife told him that he "threatened [another female musician] (professionally) MANY times." January 2, 2019 email from Plaintiff to Sélène Saint-Aimé, attached as Exhibit N to the White Decl.

> [W]hat I meant by everything is all the shit your teasing ass has been teasing me with for the last months. You know what I want, don't pretend… By 'immediately' I mean you coming to my room 'right away' and taking care of me the moment we arrive at the hotel in Paris without delays, arguments or debates.[66]

Later that year, Grand was to accompany Coleman to a residency and told him she did not intend to sleep with him,[67] he wrote: "I've been attracted to you from the beginning. Back when you were getting free lessons you had no problem with it. In fact, you liked it. Now that you are a little better, now you want to tell me how to be?"[68] He told her: "you can go to LA, but if you decide that you want to redefine our relationship, then you have to deal with my response, just like I have to deal with you."[69]

Coleman made other sexual advances that Grand did not want. In June 2016, on another tour, when Grand refused sex one night, Coleman climbed half-naked on top of her, "kissing me on the mouth and touching my body."[70] Only after Grand rebuffed him *yet again* did Coleman, protesting, leave. When she confronted him the following day, he told her she was "making a big deal out of a very minor thing."[71]

The last sexual encounter, in September 2016, was like the first. Grand "was pursued for a long time by" Coleman and finally agreed to "hang out with him" at his home, but she "didn't want to actually have sex with him."[72] "Then he wanted to have sex, and I didn't want to have intercourse with him, so I let him masturbate on my leg."[73] Again, Grand does not and has never asserted that any sexual encounter with Coleman was criminal in nature. Moreover, Grand concedes that, for complex reasons, she initiated aspects of the relationship. Grand would later

---

[66] September 4, 2015 email, attached as Exhibit O to the White Decl.
[67] November 22, 2015 email between Plaintiff and Defendant, attached as Exhibit P to the White Decl., at 2.
[68] *Id.*
[69] *Id.*
[70] Ex. A, at 57:7–12; Grand Decl., ¶ 21.
[71] *See* ECF No. 87, Ex. EE.
[72] Ex. A, at 58:7–11.
[73] *Id.* at 58:16–19.

write that "I fell in love him."[74] And that was true: in September 2013, she hoped Coleman

would leave his wife and marry her.[75] And Grand sometimes initiated sex because, as she would

later write, "I felt that I needed him in my life in order to survive, to learn, to thrive, and to

become a professional musician."[76] As she would also write, she was "maybe slightly

manipulative, to be honest."[77] She also wrote:

> There was many times where I played into his game. Where I said
> what he wanted to hear. Where I initiated conversation with him,
> and when I tried to keep in contact when he had told me to leave
> him alone. I simply felt that if I lost contact with him, I would lose
> contact with music, with my purpose in life, and with my work.[78]

The Parties' relationship, predictably, fell apart.

## III.    STANDARD ON MOTION FOR SUMMARY JUDGMENT

 "Summary judgment is appropriate if there are no genuine issues of material fact and the

movant is entitled to judgment as a matter of law." *McCarthy v. Am. Int'l Grp., Inc.*, 283 F.3d

121, 123–24 (2d Cir. 2002). "A dispute regarding a material fact is genuine 'if the evidence is

such that a reasonable jury could return a verdict for the non moving party." *Id.* at 124 (quotation

marks omitted). The moving party "bears the initial responsibility of informing the district court

of the basis for its motion, and identifying those portions of the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, which it believes

---

[74] ECF No. 87, Ex. A at 3; *see also* Ex. A, at 112:5.
[75] Ex. A, at 112:4–14.
[76] ECF No. 87, Ex. A at 3.
[77] *Id.* at 2.
[78] ECF No. 87, Ex. A at 4. Coleman's expert forensic psychologist confirmed that this is not unusual behavior in a relationship. Deposition of Dr. Robert Gordon, September 25, 2019, attached as Exhibit Q to the White Decl., at 170:3-14 ("I have said sweet bullshit to people to try to calm them down…I'll act like I agree with them because to disagree with them would escalate things. And it doesn't mean I really believe them…people do that in relationships.").

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The court "must also be mindful of the underlying standards and burdens of proof…because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment." *Rojas v. Splendor Landscape Designs Ltd.*, 268 F. Supp. 3d 405 at 409 (E.D.N.Y. 2017). Once that initial burden is met, the burden shifts to the nonmoving party to "come forward with specific facts showing that there is a genuine issue for trial." *McCarthy*, 283 F.3d at 124.

## IV.    ARGUMENT

### A.    Plaintiff's Defamation Claim Fails as a Matter of Law.

Coleman claim for defamation fails as a matter of law, confirming why summary judgment should be entered for Grand. Again and again, his brief characterizes the dispute as one of whether Coleman did not "behave to [Grand's] liking" or whether she, in fact, "manipulated [him] to gain professional advantage."[79] That is precisely why Grand's Letter consists of opinion and is not defamatory. The Letter described Grand's relationship with Coleman, and it attempted to describe the complex highs and lows it entailed. The Letter narrated how they met, how Grand pursued further lessons with Coleman, how he gradually won her over into a sexual relationship, how Grand felt that relationship was an exchange for Grand's continued advancement with Coleman, how Coleman behaved badly at times, how Grand loved Coleman at times, how Grand felt conflicted and at times wanted intimacy and at other times pretended to want intimacy to play Coleman's game, and how the relationship eventually collapsed. She made clear that "I

---

[79] ECF No. 83, at 19.

don't intend to cast myself as only a victim of the situation,"[80] that there were "very important things I learned from him,"[81] and that "I am conflicted as to what to make of it."[82]

As Grand's motion for summary judgment explains, her characterizations of a sexual relationship that indisputably (1) occurred, (2) was tumultuous, and (3) involved an imbalance of age and power are opinion. Her Letter "does not contain a provably false factual connotation" and thus merits "full constitutional protection." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). The Letter rightly proposes an opinion while showing the reader the necessary facts to evaluate it fairly. Coleman identifies no material omission and fails to identify even one defamatory falsehood.

The evidence reveals that Grand's Letter is true insofar as it asserts anything factual and is, if anything, too kind to Coleman. The record in this case is far more damaging to Coleman than Grand's Letter. Grand sent the Letter to only a small group of her friends and colleagues whom she believed had a genuine interest in the topic—changing the imbalance of power in the jazz industry.[83] She had good reason to believe that they did. The Letter did not name either Coleman or Grand, so a reader unfamiliar with either would have no idea whose relationship it described. And those who could identify them, as Coleman extensively points out, already knew about the relationship and had witnessed its dysfunction firsthand.[84]

The record, which must be construed to favor Grand in all respects at this stage, will show that Grand's Letter was completely accurate in all respects and spared the reader the

---

[80] ECF No. 87, Ex. A at 1.
[81] *Id.*
[82] *Id.* at 6.
[83] Grand Decl., ¶ 22.
[84] ECF No. 82-2, ¶¶ 3-19.

raunchy details, lurid messages, and Coleman's manipulative verbiage that would have been left under wraps had Coleman not papered the town and the internet with it himself.

### 1. Coleman Must Identify A Statement That Is Defamatory and False, He Does Not.

It is Coleman's burden to show that Grand tendered a statement that is both false and defamatory. To that end, Coleman cites four statements and the Letter "as a whole." His assertions on each point are meritless and weigh in favor of summary judgment for Grand.

> *a.* *"About six months after I moved to NY in 2011, he convinced me to be intimate with him."*

First, Coleman asserts that Grand's statement that he "convinced" her into bed is a "fabrication" that "paint[s] him as a predator."[85] But the law requires a "fair reading of the text," *Drug Research Corp. v. Curtis Pub. Co.*, 7 N.Y.2d 435, 440, 166 N.E.2d 319, 321 (1960), and Coleman's reading is absurd. Coleman has things exactly backwards: a false assertion that Coleman slept with Grand *without* first convincing her would be defamatory. Grand's careful couching of this phrase to avoid any implication of forced intercourse—and, hence, rape—shows only that Grand is not inclined to exaggeration.[86] And, if Coleman believes the reader's knowledge that he is "older" than Grand would lend this otherwise innocuous statement a predatory meaning,[87] his problem is reality, not Grand's Letter: it is an immutable fact that he is 36 years Grand's senior.[88]

---

[85] ECF No. 83, at 11.
[86] It is telling that Plaintiff's complaint accuses Grand of accusing him of rape, yet he abandons that position in his Motion. This betrays a poor grasp of her Letter's actual meaning, which still escapes Coleman.
[87] ECF No. 83, at 11.
[88] Nor does Grand's Letter paint her as "the young, innocent teenager." It discloses that she had previously engaged in sex. Letter at 1. Disclosure of any further details concerning Grand's sexual relationship with any person other than Coleman is protected by the Apr. 12, 2019 and May 30, 2019 Protective Orders of this Court and may not explored further. *See* ECF Nos. 42 and 50.

Coleman is also wrong that the statement can be proven false. Whether or not "it was Grand who manipulated Plaintiff,"[89] is unknowable because it is subjective opinion. Initiation and persuasion are inherently subtle and ambiguous. The Parties agree that nearly two years passed between when they met and their first sexual encounter. During that time, they sent thousands of messages and met numerous times. Even a comprehensive study of these exchanges would fail to identify who bears the ultimate responsibility for "initiating" the encounter.

Grand testified that Coleman "pressured me a lot in different ways for me to have sex with him."[90] There is more than enough evidence to support Grand's story that "he convinced me to be intimate with him." A 2009 message from Coleman stated that he was "attracted to" Grand and expressed frustration by her "limits."[91] Grand was 17. In 2010, Grand told Coleman "I love you as a father" and "you expect one kind of things and I expect another kind of things."[92]

Coleman responds with evidence of his own, which he says demonstrates that Grand initiated the first sexual encounter. But Coleman's evidence fails to establish any falsehood. A text by Grand to Coleman that "its not like you forced me or something!"[93] is entirely consistent with the Letter, which never alleges forced sex. And an email by Grand to another man that "I want to experiment [sic] with Steve" was referencing Grand's resolution that, after being pursued by Coleman, she agreed to an experiment to sleep with Coleman for a limited period of time to "see how the relationship went."[94] This shows both why Grand's assertion is one of opinion and why it is accurate.

---

[89] ECF No. 83, at 11.
[90] Ex. A, at 34:6–7.
[91] Ex. F.
[92] Ex. G.
[93] *See* ECF. Nos. 35, at PageID #377 and 35-1, at PageId #396.
[94] Grand Decl., ¶ 19; June 12, 2011 email from Defendant, attached as Exhibit R to the White Decl.

> b.  *I was sexually harassed inside of a professional relationship.*

Second, Coleman alleges that he was defamed by Grand's references to sexual harassment. But Grand's use of the term comes with an extensive context—i.e. the entire Letter—and it must be read as a whole, "tested by a 'fair', not a 'broad', reading." *Drug Research Corp.*, 7 N.Y.2d at 440, 166 N.E.2d at 321. Grand's use of the term "sexual harassment" is clarified by the encounters with Coleman she set forth in her Letter, not by civil statutes defining "workplace sexual harassment."[95] Coleman wrongly asks the Court to go out of its way to find a "damaging statement,"[96] where Grand simply uses the term to characterize the facts she disclosed.

"[I]f a statement of opinion either discloses the facts on which it is based or does not imply the existence of undisclosed facts, the opinion is not actionable." *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997). The term "sexual harassment" is not used in a vacuum. The reader can review Grand's Letter as a whole, evaluate the facts Grand provided, and make an independent determination about whether sexual harassment occurred; thus, the term is one of opinion, not an independent assertion of fact. *See, e.g.*, *Mirage Entm't, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 38 (S.D.N.Y. 2018).

Coleman impliedly recognizes all of this. He does not identify falsehoods in Grand's Letter (let alone *defamatory* falsehoods) but responds with the equally subjective assertion of opinion: "it was Ms. Grand who manipulated Plaintiff to gain professional advantage."[97] That is unverifiable and, besides, not in conflict with Grand's Letter, which discloses that she was "hooked" on Coleman, "craved his attention," and even that she was "slightly manipulative."

---

[95] ECF No. 83, at 12.
[96] *Id.*
[97] *Id.* at 11.

The evidence overwhelmingly shows that Coleman demanded, overtly and subtly, sex in exchange for professional advancement. This is one form of sexual harassment, even under its strict, legal meaning (which, again, is not its only meaning). *See, e.g.*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998) ("[I]f an employer demanded sexual favors from an employee in return for a job benefit, discrimination with respect to terms or conditions of employment [is] explicit."). As discussed, there are many examples that some of Coleman's sexual advances were unwanted, which is another strict, legal meaning of sexual harassment. *See, e.g., Jackson v. NYS Dep't of Labor*, 2012 WL 843631, at *5 (S.D.N.Y. Mar. 12, 2012).

A harassment analysis cannot simply disregard, as Coleman does, that night he climbed on top of her while she was sleep in a bid to initiate a sex.[98] Coleman explains it was not harassment because he left when she said no, but this is not true.[99] Coleman left when she said no *the second time*. Coleman's refusal to acknowledge the egregiousness of this event (identifying it as false in his interrogatories because "She said no and I immediately stopped and left") is perfectly in keeping with the theme of his case (because Grand wanted it *sometimes*, he was right to solicit it from her at *anytime*…even if she had already said no).

Coleman cites text messages and emails by Grand for the proposition that Grand wanted sex with Coleman, but this argument is illogical and wrong. Even if Grand initiated in some instances, unwanted advances can qualify as sexual harassment in others. Grand's Letter does not suggest otherwise; it represents only that there were "times where I was sexually harassed." Thus, it could not be dispositive as a matter of law that "Grand offered Mr. Coleman sexual favors in exchange for the opportunity to travel to Chicago,"[100] that "Grand doggedly pursued

---

[98] *See* Ex. A, at 57:7–12.
[99] ECF No. 87, Ex. F, at 29.
[100] ECF. No. 83, at 12.

him" and "texted Plaintiff,"[101] that "Grand sent Plaintiff an angry email berating him for not caring about her enough or talking to her enough,"[102] or that "Grand…initiated the [Parties'] last sexual encounter."[103] Coleman does not cite any evidence somehow demonstrating that Grand did not *feel* pressured by Coleman to agree to this exchange.

And yet there is evidence that shows that she did communicate to Coleman that she felt pressured. For example, when she lamented that he cared more about her sexually than professionally, he berated her for complaining about "some sex."[104] In another email exchange, Coleman dismissed Grand's feelings of pressure, telling her he doesn't want any part of what he calls her "*minimal appeasement program*" that is "giving just enough to get what you want and keep me from going off."[105] And, again, reminding her just how much he has done for her and how ungrateful she is.[106] The correspondence is perfectly consistent with pressure by Coleman and Grand's "play[ing] his game," as Grand characterizes it in her Letter.

Failing at all that, Coleman offers his own expert's baffling opinion that Coleman's "sexual rituals preclude the possibility of coercion" as conclusive *as a matter of law*.[107] (The sexual rituals in question being Coleman's self-diagnosed germ phobia and fetish to slather himself and his partner in oil (olive or grapeseed, usually)). Coleman's "sexual rituals" did not prevent him from demanding sex in Paris from Grand "without delays, arguments or debates."[108] They did not prevent Coleman, half naked, from physically assaulting Grand while she slept.

---

[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] Ex. L.
[105] ECF No. 87, Ex. J, at 1.
[106] February 4, 2015 emails between Plaintiff and Defendant, attached as Exhibit S to the White Decl.
[107] ECF No. 83, at 13.
[108] Ex. O.

They plainly do not "preclude the possibility of coercion," a fact even his expert admitted when pressed under oath,[109] as well as his expert opinion that Coleman is "obviously [] biased."[110]

> c.     *By that point, though [Sept. 2013], I wasn't in love with him anymore. I didn't want to be intimate anymore. That period is when the sexual harassment started."*

Grand's Letter comes with ample supporting material allowing the reader to evaluate her opinion of this statement. Grand's Letter states: "I remember it felt like a limb of mine was gone. I was angry, and furious, and sad, and I felt completely abandoned."[111] She further admitted that she "craved his attention."[112] No reasonable reader, taking the Letter as a whole, would conclude that, from 2013 on, Grand's posture in the relationship was total resistance, and Grand does not assert that it was.[113] The reader can take those facts together with Grand's other assertions in context and make an informed assessment of Grand's opinion. This is, then, non-actionable.

And, yet again, the evidence supports Grand and cuts against Coleman. As described above, Grand *was* harassed after September 2013, as cited extensively above. A full accounting of all of the harassment that occurred during that time would take far more pages than this Court needs to read to deny Coleman's Motion and grant Grand's. While this harassment was taking place, the evidence is clear that Coleman knew that Grand did not love him anymore but he felt compelled to pursue her. In March 2016, Coleman and his wife fought about their marriage, in particular Coleman's obsession (his word) with Grand. Coleman wrote to his wife "Maria does

---

[109] Ex. Q, at 154:22-159:22.
[110] *Id.* at 124:19-124:24
[111] ECF No. 87, Ex. A, at 3.
[112] *Id.*
[113] As Grand has previously clarified, her letter does not allege that Coleman harassed her for the entirety of 2013 to 2016 but rather that "up until September 2013, I felt I was in love with Steve" and "it took me a while to get over that" and *then* I fell that the sexual harassment started." Ex. A, at 50:4-50:11.

not want me!" and admitting that Grand "got tired" of the manipulation "as she got older."[114]
But, he wrote, "I AM OBSESSED. I have a fixation [with Grand]."[115]

>    d.    *"He would call me in the middle of the night and never take no for an answer."*

Fourth, Coleman cites Grand's statement that he would call her in the middle of the night and not take no for an answer. But the fact that a man propositions a woman for sex, even in an obnoxious way, does not expose him to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace…in the minds of right-thinking persons." *Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 163 (E.D.N.Y. 2014) (cleaned up). Not every libidinous and annoying boyfriend is "a sexual predator."[116] What "would" happen on various occasions is self-evidently Grand's characterization of the intense quarrelling both sides concede occurred.

And, even if this were somehow material, Coleman misreads this statement. In the previous sentence, Grand stated: "He would send me work to do and then get angry and tell me not to finish the work…." Thus, in context, the following statement that he would "never take no for an answer" refers to the impossible assignments.[117] Coleman points to the last phrase of the first sentence: "He would send me work to do and then get angry and tell me not to finish the work, *because I wouldn't sleep with him*."[118] He explains that this simply must render the following statement a reference to sex, but this is a classic ambiguity.

>    e.    *The Letter Taken as a Whole.*

---

[114] March 21, 2016 email from Plaintiff, attached as Exhibit T to the White Decl., at 20-21.
[115] *Id.* at 16.
[116] ECF No. 83, at 14.
[117] Grand Decl., ¶ 26.
[118] ECF No. 83, at 13-14 (emphasis added).

Finally, Coleman cites the Letter "taken as a whole," is defamatory insofar as it contains a "poor, victimized tone" and is an "attempt to smear the Plaintiff's reputation."[119] But the mere reference to the Letter or its purported tone and purpose does not meet Coleman's burden of identifying the defamatory statement. Even if Coleman's characterizations were accurate, asserting one's status as the victim of a sour relationship or having a purpose to "smear" someone is not defamatory. The law does not prohibit people from talking about former significant others or even saying bad things about them.

And Coleman's characterizations are simply wrong. It is entirely unserious to read the Letter as calling Coleman as "sexual predator." Nothing in the Letter supports that. It does not allege forced sex or sex with a person who is underage. Its assertion that Coleman did some *convincing* is not (as discussed above) even remotely an assertion of predatory behavior.

And Coleman fares no better in asserting that Grand's Letter gave a "false perception of plaintiff's character."[120] It is not false that Coleman is an adulterer, that he slept with an unmarried woman 36 years his junior, or that his relationship with Grand, by and large, failed. What is left of his character in light of those facts? Aside from being libel proof in this arena, Coleman cannot meet his burden by vague references to "character." *See, e.g.*, *Belvision Inc. v. M & G Elecs., Inc.*, 134 A.D.2d 313, 313, 520 N.Y.S.2d 790, 791 (1987) (finding vague assertion of "defamation of character" failed to assert a claim); *Majer v. Metro. Trans. Auth.*, No. 90 CIV. 4608(LLS), 1990 WL 212928, at *7 (S.D.N.Y. Dec. 14, 1990) (same).

And, as discussed above, Coleman abides by no iota of "sexual morality" or "professionalism." His defamation claim is entirely meritless.

---

[119] *Id.* at 14.
[120] *Id.* at 10.

## 2. Coleman Identifies No Defamation *Per Se* or Special Damages.

Coleman's also fails on the element requiring a showing of libel *per se* or special damages—he shows neither—and it remains a fatal flaw even if the Court somehow finds a defamatory assertion somewhere in Grand's Letter (a feat Coleman has so far failed to perform).

First, his effort to show that Grand imputed unchastity to a woman fails for many reasons.[121] The biggest problem is that Coleman *is* unchaste. In that March 2016 argument with his wife regarding his obsession with Grand, Coleman wrote to her:

> Part of it is my basic moral views. I don't see myself as being "sexually unfaithful." I don't have or feel a "social stigma" about sex. I don't need "forgiveness". And I don't feel "shame". I've never had sex with anyone of the same sex or with children or minors. I've thought or fantasied about this, but have never felt the urge to act on it, and I don't feel "shame" about fantasies. I've also fantasied about sex with dogs, monsters, insects or aliens, but this does not mean that I want this in real life. Anyway, I have no shame about these things.[122]

So even if this category somehow includes any assertion impugning a person's "sexual morality,"[123] Coleman has no colorable claim to it.

As for injury to profession, Coleman offers no meaningful tie between "sexual morality" and jazz performance. He says that, "obviously," the assertion that he is "a sexual predator" would "tend to hurt Plaintiff in his trade or business," but no one said he is a predator,[124] and it is not obvious that an attack on his "sexual morality,"[125] if he had any, would be relevant to jazz performance. Coleman himself acknowledged this in a 2014 text to Grand trying to persuade her that trading sex for access is normal in the jazz industry: "Renee Rosnes…sucked Herbie Hancock, and she got a certain amount of access. I'm sure Bird fucked men as well as women,

---

[121] *See* ECF No. 86, at 31, n.131.
[122] Ex. T, at 20.
[123] ECF No. 83, at 14.
[124] *Id.*
[125] *Id.* at 1.

cats who idolized him or where trying to get next to his music" and that maybe doing so helped their careers.[126] Nothing in Grand's Letter imputes his "lack of ability," *Castro v. Total Home Health, Inc.*, 2004 WL 1588261, at *4 (N.D.Ill. July 9, 2004), and the Letter therefore does not "allege a link between a particular profession and a particular disreputable vice of that profession." *Kforce, Inc. v. Alden Pers., Inc.*, 288 F. Supp. 2d 513, 516 (S.D.N.Y. 2003).

Coleman responds[127] that several members left his ensemble after seeing Grand's Letter, but in each case he cites only to his own testimony for support. The available evidence suggests a number of other reasons for at least some of these departures—health problems, family issues, travel plans, competing professional engagements, scheduling conflicts, and being fired by Coleman.[128] The evidence also suggests that some people had issues with the relationship in general, regardless of the alleged harassment, and others broke with Coleman due to their disgust at his filing this lawsuit.[129] Determining the direct cause of any musician's decision not to perform with Coleman following November 14, 2017 is further compounded by the fact that Coleman personally attacked and berated many of the musicians he now laments won't play with him.[130] Their willingness to play with him again in the future will certainly not be helped by the fact that he unnecessarily subpoenaed most of them.[131]

Regardless, this argument does not explain how Grand's Letter is "injurious by [its] very nature," which is what defamatory *pe se* means.[132] *Yonaty v. Mincolla*, 97 A.D.3d 141, 144, 945 N.Y.S.2d 774, 777 (2012). Coleman's reference to cancelled performances (which were

---

[126] July 29, 2014 text messages between Plaintiff and Defendant, attached as Exhibit U to the White Decl.
[127] *See* ECF No. 83, at 15.
[128] *See* Ex. Y.
[129] *See* ECF No. 86, at 27, n.124; *see also* ECF No. 87, Exs. FF, GG, HH, and II.
[130] *Id.*
[131] *See* ECF Nos. 61-74, and 76.
[132] The fact that people close to Coleman and able to vet the facts left his ensemble lends credibility to the Letter itself, since falsehoods would be unlikely to persuade people close to Coleman able to discern falsehood from truth. This is yet further evidence a jury could interpret against Coleman.

cancelled only after *he* republished the Letter) is unavailing for the same reason: there is no inherent, logical tie between his sexual morality and musical ability. To establish *per se* defamation here, Coleman must identify "a direct attack upon the business, trade or profession of the plaintiff," *Kforce, Inc.*, 288 F. Supp. at 516 (quotation marks omitted). Grand's Letter draws a clear line between his private behavior and his performance. She stated: "I do admire him and respect him immensely as a musician and an elder."[133] Because "statements cannot be slanderous per se if reference to extrinsic facts is necessary to give them a defamatory import," *Aronson v. Wiersma*, 65 N.Y.2d 592, 594–95, 483 N.E.2d 1138 (1985), Coleman's resort to extrinsic evidence only shows why defamation *per se* does not apply. He bears the burden on the merits and his Motion fails even to try to meet it.

Coleman's claim to special damages fares no better. Because special damages are limited to the "loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation," *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) (internal quotation marks omitted), the resignation of band members does not qualify. Coleman admits that the cost of the departures "cannot be quantified,"[134] so they cannot be special damages. Nor does the loss "friendship"—from friends who believed Grand, not Coleman—to which "no dollar amount can be assigned."[135] "To satisfy the special damages requirement, a plaintiff must set forth an itemized account of her losses." *Nunez v. A-T Fin. Info. Inc.*, 957 F. Supp. 438, 441 (S.D.N.Y. 1997). Coleman's concession that no itemization is even possible dooms his reliance on this form of harm.

---

[133] ECF No. 87, Ex. A, at 5.
[134] ECF No. 83, at 15.
[135] *Id.* at 16.

Coleman's reliance on cancelled performances also fails. As Grand's summary judgment motion explains, the loss of future income does not qualify under New York law.[136] Coleman proves this point yet again conceding that he needs "a jury trial strictly on the issue of damages" to establish a dollar value to his claims.[137] Coleman should already have provided an itemized amount of damages, so the fact that he still does not know how much he lost sinks his claim.

Coleman argues for the first time in the Motion that he has not been able to show damages in 2018 because "gigs are normally arranged up to 1 year in advance."[138] Coleman's assertion that gigs are not cancelled once scheduled directly contradicts much of his deposition testimony.[139] It also contradicts the evidence which shows that the gigs he alleges were cancelled as a slow building result of Grand's Letter were actually the immediate fallout from his filing this lawsuit, thus showing that his "1 year" rule does not hold.[140] Even were that to be true, publicity and accolades are subject to no such contracts or restraints and Coleman was awash in both throughout 2018.[141] Coleman concedes that his damages were not incurred until "late 2018 and 2019,"[142] which coincides neatly with the timing of this lawsuit, filed in October 2018, when he made Grand's private letter public. The timing also follows more than six months of Coleman's no-holds barred attacks on every "friend," colleague, reporter, promoter, and venue that he perceived even the slightest doubt from. If 2019 was Coleman's "worst year since 1985,"[143] that is his own fault.

---

[136] *See* ECF No. 86, at 35.
[137] ECF No. 83, at 20.
[138] ECF No. 82-2, at ¶ 24.
[139] Coleman Dep., April 18, 2019, at 76:2-76:14; 76:23-77:2; 77:25-78:9; 83:23-84:2; 84:17-85:22; 88:25-89:7; 106:10-106:18; 108:23-109:5; 167:3-167:10, attached as Exhibit V to the White Decl.; *see also* Grand Decl., ¶ 30.
[140] *See* ECF No. 86, at 13-16.
[141] Ex. V, at 119:9-127:25; 167:13-170:4.
[142] ECF No. 83, at 15.
[143] ECF No. 83, at 16.

His claim fails as a matter of law.[144]

### 3. Coleman Has Not and Cannot Demonstrate the Requisite Fault.

Coleman cannot show actual malice and any lesser standard of fault. He, in fact, can show none—at least not as a matter of law.[145]

"Actual malice requires proof that the publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of its truth or falsity." *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 182 (2d Cir. 2000). A plaintiff must meet the standard with "clear and convincing proof." *Id.* at 183. Whether the standard is met is a question of fact, so long as the plaintiff (not the defendant) "provides evidentiary facts-and not mere conclusory allegations-that the defendant was motivated by actual malice." *Amadsau v. Bronx Lebanon Hosp. Ctr.*, 2005 WL 121746, at *13 (S.D.N.Y. Jan. 21, 2005), report and recommendation adopted 2005 WL 954916 (S.D.N.Y. Apr. 26, 2005), aff'd, 225 F. App'x 32 (2d Cir. 2007).

As Grand's summary judgment motion describes (at 41–42), Coleman cannot plausibly show that Grand knew or should have known that Coleman was not manipulative and abusive, especially when Coleman admits to the facts serving as the basis for Grand's assertions. *See Hughs v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 453 (S.D.N.Y. 2018).

For present purposes, however, it is sufficient that Coleman cites no meaningful evidence of actual malice or negligence, and there is none. "Actual malice can be established through the defendant's own actions or statements, the dubious nature of his sources, and the inherent improbability of the story among other circumstantial evidence." *Celle*, 209 F.3d at 183 (cleaned

---

[144] *See* ECF No. 86, at 35-38.
[145] The actual-malice standard applies for reasons Grand stated in her summary judgment motion. Coleman cursorily objects (*see* ECF No. 83, at 8) to the standard but provides no reason for it not to apply.

up). Here these factors weigh *against* actual malice. There is no "dubious nature" to Grand's sources; her Letter was written from first-hand knowledge, and her story in inherently probable.

Coleman relies on Grand's subjective belief that sending her Letter might result in "legal repercussions."[146] But this conflates an awareness or recklessness as to "either falsity or probable falsity of the defamatory statement," *Celle*, 209 F.3d at 182, with a practical concern with abusive legal process. At no point—never—did Grand state that she worried her Letter might be factually inaccurate. The statements Coleman cites pertain entirely to her subjective view that a meritless lawsuit like this one was possible. It is well known that defamation suits are often specious and are brought to be the punishment in themselves. *See, e.g.*, George W. Pring, SLAPPs: Strategic Lawsuits Against Public Participation, 7 PACE ENVTL. L. REV. 3, 3, 9–11 (1989).

Indeed, Grand's actions disprove actual malice or even negligence: she did not name Coleman or herself in an attempt to limit the number of readers who would understand the letter. She also attempted to limit the number of readers who received the Letter only to those who were truly interested. Grand did this because "I did not write my letter in order to hurt" Coleman but rather "to help change the culture of the music industry."[147] Coleman's assertions about Grand's "ill will and animosity,"[148] are factually baseless and, besides, legally insufficient. *Celle*, 209 F.3d at 183 ("[E]vidence of ill will is not sufficient to establish actual malice.").

## B. Grand's Counterclaims Survive as a Matter of Law.

The only claims suitable for trial in this case are Grand's counterclaims for defamation and intentional infliction of emotional distress. Coleman's statements about Grand starkly vary

---

[146] ECF No. 83, at 10.
[147] Ex. A, at 76:24–77:5; Grand Decl., ¶ 25.
[148] ECF No. 83, at 10.

from those in Grand's Letter: she expressed opinion (which is thoroughly supported by the evidence), Coleman attacked Grand calling her a liar, accused her of publishing false statements, intentionally leaving statements out of her Letter, and impugned her place in the jazz industry and in her nonprofit work. Coleman's Motion on Grand's counterclaims fails as a matter of law and should be denied.[149]

### 1. Grand Can Show Defamation.

Grand's claim for defamation is sufficient to reach a jury because there is evidence supporting each and every element.

Coleman "published a defamatory statement of fact to a third party" that was "false," or so a reasonable jury could conclude. *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 485 (S.D.N.Y. 2013). On May 5, 2018, Coleman published an eight-page letter to about 80 recipients accusing Grand of lying.[150] The letter stated that the assertions in Grand's Letter were "false" and that Grand "was consciously trying to manipulate emotions of sympathy from the recipients of her letter."[151] Coleman also accused Grand of having "deliberately left out" facts from her Letter, especially the supposed fact "that there was sexual aggression on her part."[152] Coleman accused Grand directly of "bullying, intimidation, black-balling and lying."[153] In an October 24, 2014 public Facebook post, Coleman accused Grand of "covertly spread[ing] misinformation" and that she "deliberately lied…by co-opting the very necessary, warranted and powerful #MeToo

---

[149] Grand hereby withdraws her counterclaim for loss of employment or other income and seeks these damages solely as a byproduct of her defamation claim. Grand's counterclaims are the product of her having been brought to court first, and they assume that the Court will send Coleman's claims to trial. They are viable claims that survive Coleman's Motion as a matter of law but she did not want any lawsuit and would be happy to walk away with none, if the Court agrees with Grand's summary judgment positions.
[150] *See* ECF No. 87, Ex. C.
[151] *Id.* at 1, 3.
[152] *Id.* at 3.
[153] *Id.*

movement."[154] He also accused her of making a "threat" against him on Facebook, which Grand did not do.[155] He made similar comments about her on Wikipedia.[156] These statements are reasonably susceptible to the charge of dishonesty, deceit, and falsehood. *See Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 625 N.Y.S.2d 477, 649 N.E.2d 825, 829 (1995). These are assertions of fact, not opinion, that are verifiable, and they concern Grand, who was named in the Letter.

These assertions are defamatory—in fact, defamatory *per se*. Assertions of "any kind of fraud" or "dishonesty" amount to libel *per se*. *See, e.g.*, *Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 768, 392 N.Y.S.2d 297, 298 (1977); *Celle* 209 F.3d at 180. Courts in New York have held that accusing someone of lying about sexual misconduct may be grounds for a defamation claim. *Zervos v. Trump*, 171 A.D.3d 110 (N.Y. App. 2019) (finding that denial of allegations of sexual misconduct, which are capable of being proven true or false, may reasonably be susceptible of defamatory meaning). The defamatory nature of Coleman's assertions is clear in that he directly tied them to Grand's two related professions.

Coleman accused Grand of "bullying" a "member of our musical community" (himself). In sharp contrast to Grand's Letter—which reaffirmed her respect for Coleman as a musician— Coleman's asserted Grand's unfitness to participate in the "musical community." Unlike chastity, its own libel *per se* element, honesty is a prerequisite for fitness in business. *See, e.g.*, *Loewinthan v. Beth David Hosp.*, 9 N.Y.S.2d 367, 374 (Sup. Ct. 1938); *Kasavana v. Vela*, 172 A.D.3d 1042, 1046, 100 N.Y.S.3d 82, 87 (N.Y. App. Div. 2019). Coleman's references to Grand's purportedly unacceptable conduct in the "musical community" "carry the clear import

---

[154] *See* ECF No. 87, Ex. X.
[155] *See* ECF No. 87, Ex. AA.
[156] *Id.*

that [she] has done something wrong as a" musician, and they "must have so been understood by the hearers of the remark." *Loewinthan*, 9 N.Y.S.2d at 374.; *cf. also* W. Page Keeton, et al., *Prosser and Keeton on Torts* § 112, 792–93 (5th ed. 1984) (noting that a statement that the plaintiff is "dishonest" impairs fitness to "any" of many distinct professions).

Second, Coleman attacked Grand's professional role in the organization We Have a Voice, a cooperative established to promote new norms of behavior in the music industry.[157] Coleman's letter addressed We Have a Voice and asserted that Grand's lies call into question "the credibility of the organization and its entire premise."[158] This statement asserts Grand's "unfitness" to participate in a cooperative concerned with behavior in the music industry, since lying about sexual harassment "would certainly be incompatible with the proper conduct of" of an organization devoted to maintaining professionalism between men and women musicians. *Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250, 261, 633 N.Y.S.2d 106, 113 (1995).

People devote substantial time and resources to their volunteer work,[159] and statements that tend to injury them in that capacity, frustrating their efforts to contribute to the greater community, are no less damaging than statements tending to harm their remunerative work. If anything, this type of injury is better suited for *per se* treatment, since it is difficult to quantify the loss of value from inability to perform in such a role.

---

[157] Grand Decl., ¶ 31.

[158] ECF No. 87, Ex. C, at 1.

[159] The fact that Grand works with We Have a Voice on a volunteer basis is irrelevant. "[N]othing in the case law indicates that payment for one's services is necessary for an activity to be considered a party's business or profession for the purpose of stating a legally cognizable defamation per se claim." *Muzikowski v. Paramount Pictures Corp.*, 2003 WL 22872117, at *4 (N.D. Ill. Dec. 3, 2003) (holding that "volunteer work [can] be a person's profession"); *Kowalski v. Greski*, 2009 WL 1218666, at *1 (Conn. Super. Ct. Apr. 9, 2009) (holding that attack on a plaintiff's "profession as a volunteer bookkeeper" would "constitute[] libel per se," if it had been defamatory); *Workman v. Kroger Ltd. P'ship I*, 2007 WL 2984698, at *5 (S.D.W. Va. Oct. 11, 2007) (finding evidence of harm to plaintiff's role as a "volunteer" qualified for libel per se).

Given the express references to both professional capacities in Coleman's letter, his close links between Grand's supposed dishonesty and her roles in both professions, and his failure to draw a line between the supposed dishonesty and the profession, a reasonable jury could find the letter defamatory and defamatory *per se*. Coleman's statements were false and plainly so. Coleman admitted many facts in the letter, as discussed above. Because Grand's claims are for libel *per se*, Grand has no obligation to plead and prove special damages. It is sufficient that she has suffered harm to her reputation and lost some of her ability to work.

Defendant has no response to any of this. His brief simply states that "[t]he preceding parts of this Memo clearly lay out the undisputed facts that prove that Ms. Grand's letter does indeed contain lies."[160] But, as stated above, Coleman is wrong or, at a minimum, a jury could side against him. His arguments here fail for the same reason. And, having preserved no other argument in his opening brief, he is foreclosed from raising any other arguments in reply.

## 2. Grand Can Show Intentional Infliction of Emotional Distress.

Coleman challenges Grand's claim on only one element, extreme and outrageous conduct. His challenge is meritless and he has forfeited challenges on any other grounds.

He asserts that "Defendant Grand brings to the table nothing more than the assertion that Plaintiff Coleman didn't behave to her liming during their consensual six-year sexual relationship."[161] If that is true (and, as described above, it is), then how is Coleman's claim for defamation anything but frivolous—and knowingly so?

"There is no question that in New York sexual harassment can give rise to a claim for intentional infliction of emotional distress." *Bonner v. Guccione*, 916 F. Supp. 271, 276 (S.D.N.Y. 1996) (quotation marks omitted); *see also Collins v. Willcox Inc.*, 600 N.Y.S.2d 884,

---

[160] ECF No. 83, at 16.
[161] *Id.* at 19.

885 (Sup. Ct. 1992); *Polley v. Fed. Reserve Bank of NY*, 1994 WL 465923, at *6 (S.D.N.Y. Aug. 23, 1994); *O'Reilly v. Executone of Albany, Inc.*, 121 A.D.2d 772 (3d Dep't. 1986).

Coleman has repeatedly and publicly attacked Grand. He confronted her at a public forum she was co-hosting, confronted her at her performance, and has called her a liar in front of the entire world on social media.[162] He engaged their friends and colleagues in his crusade against her. Coleman published nude photos of Grand on this Court's docket, attached to a brief in which he again called her a liar. The emotional distress of such behavior is open and obvious. Coleman's actions have caused Grand depression, anxiety, panic attacks and physical pain.

Thus, Coleman's assertion that his sexual harassment of Grand would not "rise[] to the level of 'outrageous' as defined by New York law" is flat wrong, and Coleman cites *nothing* for this falsehood.[163] The law is clear that all of this qualifies for the tort.

---

[162] ECF No. 86, at 38.
[163] ECF No. 83, at 19.

## V.    CONCLUSION

Coleman has repeatedly asserted that "I have always been in favor of both Maria and I showing our evidence to determine the true nature of our relationship."[164] He got his wish. The evidence is out there, and it definitively does not support his claim, let alone his Motion. Coleman's Motion should be denied and the Court should find in favor of Grand.

Dated: November 22, 2019

*/s/ Mackenna White*

A. Mackenna White
Email: mackenna.white@lbkmlaw.com
Lewis Baach Kaufmann Middlemiss PLLC
405 Lexington Avenue, 62nd Floor
New York, NY 10174

Mark I. Bailen
Email: mbailen@bakerlaw.com
Katherine L. McKnight
Email: kmcknight@bakerlaw.com
BAKER & HOSTETLER LLP
1050 Connecticut Avenue NW
Washington D.C. 200036
Telephone: (202) 861-1500
Facsimile: (202) 861-1783

Cara McGourty
Email: cmcgourty@bakerlaw.com
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

*Attorneys for Defendant*

---

[164] November 20, 2018 email from Plaintiff to Sophia Wong, attached as Exhibit W to the White Decl., at 2.