UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
Steven Douglas Coleman,                       :
                                              :
                            Plaintiff,        :
                                              :          MEMORANDUM & ORDER
                -against-                      :
                                              :          18-cv-5663 (ENV) (RLM)
María Kim Grand,                              :
                                              :
                            Defendant.        :
--------------------------------------------------------------- x

VITALIANO, D.J.

On October 10, 2018, plaintiff Steven Douglas Coleman commenced this action against

María Kim Grand, bringing a libel claim and requesting damages of at least $500,000 plus

attorney's fees.  Grand filed counterclaims alleging libel and intentional infliction of emotional

distress (IIED).[1]  The parties have cross-moved for summary judgment on their respective

claims.  For the reasons that follow, both parties' libel claims and Grand's IIED claim fail as a

matter of law.

## Background[2]

From 2011 to 2016, Coleman and Grand had what both parties characterize as a rocky,

on-and-off sexual relationship.  Coleman's libel claim arises from a November 2017 email Grand

circulated to around 40 friends and industry colleagues, describing her experiences in the

---

[1] Grand also brought and dropped a claim for "loss of employment and/or other income."  *See*
Ans. to Am. Compl., Dkt. 25, ¶ 93–94; Def.'s Opp'n Mem., Dkt. 93, at 28 n.149.

[2] The relevant facts are drawn from the amended complaint, the parties' Local Rule 56.1
statements and their submissions on the motions for summary judgment, and are reviewed in the
light most favorable to the nonmoving parties.  *See Allstate Ins. Co. v. Hamilton Beach/Proctor
Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007).  Any factual disputes are noted.

relationship and her feeling that Coleman had used his age and status to harass and take advantage of her.  *See* Am. Compl., Dkt. 22, ¶¶ 51–59; Grand Email, Dkt. 1-3; Grand Letter, Dkt. 1-4.  Grand's libel counterclaim centers on, among other communications, an email Coleman sent to around 80 people in May 2018 saying her accusations were false, presenting his side of the story and including explicit text messages between the two.  *See* Ans. to Am. Compl., Dkt. 25, ¶¶ 75–92; Coleman Email, Dkt. 87-3.

Grand, an aspiring young saxophonist, met Coleman, a prominent saxophonist, when she attended a 2009 workshop he gave in New York City.  Pl.'s 56.1, Dkt. 82-1, ¶ 1.  At this first encounter, Coleman was 52 years old and Grand was 17.  Def.'s 56.1, Dkt. 85, ¶ 1.  Grand, who was visiting the United States from her home in Switzerland, asked Coleman for a lesson and, after first saying he did not work with beginners, he agreed.  Def.'s Mem., Dkt. 86, at 4–5.  There is no dispute that they did not then begin a sexual relationship, though each says the other was pursuing one.  *See, e.g.*, Coleman Tr., Dkt. 82-7, at 454:10–13; Grand Tr., Dkt. 82-6, at 33:22–23.

Grand moved to New York City in 2011, at which point she and Coleman did begin a sexual relationship, though they disagree about who initiated it.  Grand Tr. at 34:21–35:8; Am. Compl. ¶ 12.  The relationship was never exclusive—Coleman was married and saw other women, and Grand also had other relationships.  Def.'s 56.1 ¶ 3.  Grand would later say she felt pressured to have sex with Coleman in order for him to continue teaching and working with her, and to avoid his anger.  Def.'s Mem. at 5; Grand Tr. at 109:17–110:13, 131:4–132:2.  At the same time, she said she was in love with him, was "slightly manipulative" and sometimes initiated sex, which "was never physically forced."  Def.'s Mem. at 5; Grand Tr. at 112:4–5.  Coleman says the relationship was fully consensual, often with Grand pursuing him, and that he

helped her gain valuable work experience and an O-1 visa.  Am. Compl. ¶¶ 10–17.

They split temporarily in 2013, following an argument Grand says was occasioned by Coleman's wife asking for a divorce.  Pl.'s 56.1 ¶ 3; Grand Tr. at 111:10–21.  Their relationship resumed in 2014 and continued on and off for the next two years with increasing antagonism, especially when they toured together.  Grand Tr. at 85:24–86:16, 134:17–135:16; Coleman Tr. at 254:2–16.  They had their final sexual encounter in September 2016.  Grand Tr. at 57:17–58:21; Pl.'s 56.1 ¶¶ 5–6.  As with much else, they disagree on who initiated it.  Grand Tr. at 57:17–58:21, 60:18–25; Pl.'s 56.1 ¶¶ 5–6.  In November 2016, Grand told Coleman's manager she no longer wanted to work with Coleman.  Pl.'s 56.1 ¶ 7.  For the next year, they had little contact.  Am. Compl. ¶ 27; Grand Tr. at 62:5–63:15.

In May and October 2017, Grand wrote in emails and texts to Coleman that she intended to speak publicly about her concerns with their relationship, centered on Coleman pursuing her despite the gap in their age and status. Pl.'s 56.1 ¶¶  8–12.  She posted on Facebook in October that, after former Hollywood producer Harvey Weinstein's arrest for sex crimes, she was glad "skeletons are coming out."  Dkt. 1-2.  Coleman apparently saw this post, and her other messages, as "threats." Am. Compl. ¶ 31; Pl.'s 56.1 ¶¶ 10–11.  Grand, adding fuel to the fire, flat out denies that they were.  Ans. to Am. Compl. ¶ 31.  Grand also wrote an email to Coleman's estranged wife in November saying she intended to speak publicly.  Pl.'s 56.1 ¶ 13.

These communications led up to the November 2017 email and letter at the heart of Coleman's claim.  On November 5, 2017, Grand emailed seven friends, asking for help proofreading an open letter on her relationship with Coleman before she shared it more broadly.  Pl.'s 56.1 ¶ 17; Dkt. 82-13 at 50.  On November 17, Grand sent the finalized seven-page letter to around 40 people, mostly industry colleagues.  *See* Grand Email.  It recounted her history with

Coleman, but called him "X" because, she said, naming him would be "legally dangerous." *Id.* Grand said the letter described her "experience with" "sexism in the music industry," motivated by her desire to "start [] a larger conversation" on the subject. *Id.*

The letter Grand sent that lit the fireworks began by stating that she felt conversations on sexism were "long overdue," then detailed what she called an "abusive dynamic" and "sexual harassment" in her relationship with Coleman, focusing on the post-2013 period. Grand Letter at 2. She described various encounters she said disturbed her, such as waking up to find "X" in her hotel bed and having to convince him to leave. But, the letter also acknowledged that she had fallen in love with him and that she was grateful for their time together. *Id.* at 4, 6, 8. "Simply, the highs were very high and the lows were very low," she wrote. *Id.* at 4. Then circling back to where she had begun her letter, Grand claimed that, despite her anxiety and reluctance to "say something," she was "speaking out" to create change in the industry. *Id.* at 7–8.

Among the letter's statements Coleman challenges as defamatory are: "About 6 months after I moved to New York in 2011, he convinced me to be intimate with him"; "By that point [in 2013], though, I wasn't in love with him anymore. I didn't want to be intimate with him anymore. That period is when the sexual harassment started."; and "He would call me in the middle of the night and never take no for an answer." *Id.* at 4–5; Pl.'s Mem., Dkt. 83, at 10–14.

There appears to be no dispute that, as Coleman alleges, Grand authorized one of the email's recipients, Okkyung Lee, to share the letter with colleagues and journalists and name Coleman in doing so. Pl.'s 56.1 ¶ 19; Def.'s Reply 56.1, Dkt. 94, ¶ 19; Dkt. 82-13 at 14, 20, 24–25, 31. Nor is there a dispute that, on November 27, Grand named Coleman when sending the letter to seven members of the We Have Voice Collective, a group she and other artists launched "to bring awareness to issues of inequity, including but not limited to sexual harassment and

bullying" in the performing arts.  Pl.'s 56.1 ¶ 18; Dkt. 82-13 at 2–3; Dkt. 87-16.  Grand also sent

the letter to Coleman's wife, which is again undisputed.  Pl.'s 56.1 ¶ 15; Def.'s Reply 56.1, ¶¶

15.  His wife, Coleman says, knew it was about him.  Pl.'s 56.1 ¶¶ 15, 22; Def.'s Reply 56.1, ¶¶

15, 22.

Coleman claims he found out about Grand's email in January 2018.  Coleman Tr. at

209:18–24.  He testified that he lost band members as a result of it, and experienced

embarrassment and lost productivity.  *Id.* at 193:21–194:9, 199:19–204:3; Pl.'s 56.1 ¶¶ 55–57.

He alleges that, to cope, he began receiving massages and seeing a psychotherapist.  Coleman Tr.

at 180:3–181:23.  He asserts that he lost work starting in October 2018.  Pl.'s 56.1 ¶¶ 58–67;

Dkt. 82-12 at 8–28.

Striking back, on May 5, 2018, Coleman emailed a letter of his own to around 80

people—forming the focus of Grand's counterclaims.  *See* Coleman Email; Def.'s 56.1 ¶ 8; Ans.

to Am. Compl. ¶¶ 75–76.  He selected recipients whom he thought had received Grand's letter,

though some had not.  Coleman Tr. at 308:4–14, 312:5–12.  He addressed the letter to the We

Have Voice Collective.  Coleman Email at 2.  He said he was "writing this letter to categorically

denounce [Grand's] accusation as false, and to appeal to you to hear both sides of the story

before reflexively rushing to judgment." *Id*.  He said he was doing so now because, the week

before, one of the Collective's members had asked Coleman to leave a concert of Grand's, at her

request.  *Id.*  Like Grand's letter, Coleman's gave his version of the relationship.  He said it "was

unusual, intense, argumentative, and passionate, but it was also completely consensual and

should have been private." *Id.*  He said each pursued the other, and he never threatened Grand or

forced her to do anything, "which thoroughly refutes Maria's accusations of sexual harassment."

*Id.*  He called her sexually aggressive and manipulative.  *Id.* at 2–3.  He included an "addendum"

with excerpts of his texts with Grand as "small examples of evidence," some explicitly sexual and others discussing their relationship or making plans. *Id.* at 4–9. Coleman also made a few statements over the following months on Facebook, in emails and to the media, defending his position and saying Grand's story was false. Ans. to Am. Compl. ¶¶ 77–84.

Coleman filed the instant case on October 10, 2018, making Grand's email and letter available on the Court's public docket. Compl., Dkt. 1. Beginning almost immediately, he lost numerous bookings and a teaching job. Pl.'s 56.1 ¶¶ 58–67; Coleman Decl., Dkt. 82-8, ¶ 48. In explaining their cancelations, however, venues cited the lawsuit, headlines about it and their institutions' related concerns. Dkt. 82-12 at 8–28. Coleman's expert estimates his losses topped $1.2 million. Pl.'s 56.1 ¶ 68; Kucsma Report, Dkt. 82-10, at 7. Similarly, Grand claims she lost work due to Coleman's statements, as well as during their relationship, when she alleges he only booked her if she slept with him. Ans. to Am. Compl. ¶¶ 93–94.

<u>Standard of Review</u>

Summary judgment shall be granted in the absence of a genuine dispute as to any material fact and upon a showing that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of the City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Courts do not try issues of fact at the summary judgment stage, but instead merely "determine whether there *are* issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (quoting *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)).

The movant carries the burden of demonstrating there is no genuine dispute as to any material fact, *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and the motion court will resolve all ambiguities and draw all permissible factual inferences in the light most favorable to the party opposing the motion. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). Where the nonmoving party "will bear the burden of proof at trial," it bears the initial procedural burden at summary judgment of demonstrating that undisputed facts "establish the existence of [each] element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322–23. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997). When the parties cross-move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## Discussion

Although Coleman and Grand disagree on most everything else, they both describe their relationship as rocky, with numerous highs and lows. Each recalls pursuing the other and being pursued, sometimes saying no and sometimes yes to a continued personal and professional relationship. Both sides agree that the encounters, retold in their briefing, were legal and consensual. Although the parties may parse the details of those encounters, all that is in issue is whether the dueling statements Grand and Coleman published about each other give rise to plausible claims of defamation and, in Grand's case, for intentional infliction of emotional harm,

and whether on any of them any party is entitled to summary judgment in the absence of any

dispute of material issue.

I.      Coleman's Defamation Claim

Coleman's single claim is that Grand's email and letter constitute defamation as a matter

of law.  Libel is defamation in writing or print.  *See Celle v. Filipino Reporter Enters., Inc.*, 209

F.3d 163, 176 (2d Cir. 2000).  Under New York law, which applies here, a plaintiff must

establish five elements to prevail on a libel claim:

> 1) a written defamatory statement of fact of and concerning the plaintiff;
>
> 2) publication by defendant to a third party;
>
> 3) fault;
>
> 4) falsity of the defamatory statement; and
>
> 5) injury to plaintiff, either special damages or *per se* libel.

*Id.*; *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001).  Libel actions require

courts to consider both a plaintiff's interest in protecting one's reputation and society's interest in

preserving free speech rights.  *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 146–47, 87 S. Ct.

1975, 1991, 18 L. Ed. 2d 1094 (1967); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct.

710, 11 L. Ed. 2d 686 (1964).  Therefore, even though defamation actions are created by state

law, they are not solely delimited by state law.  In fact, "the elements of a libel action are heavily

influenced by the minimum standards required by the First Amendment" and any additional free

expression protections afforded speech by the state constitution.  *Celle*, 209 F.3d at 176; *Immuno

AG. v Moor-Jankowski*, 77 N.Y.2d 235, 249, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991).

These variable constitutional standards affect the fault and falsity analyses.  Libel

defendants who write about public figures and officials, or matters of public interest, receive the

protection of a heightened fault standard.  Under federal constitutional law, plaintiffs who are public figures must show defendants acted with actual malice, whereas private figures need only meet a gross negligence standard.  *Curtis Pub. Co.*, 388 U.S. at 155; *Sullivan*, 376 U.S. at 280; *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).  For statements on matters of public concern, New York law has long required all plaintiffs to show defendants acted with gross irresponsibility and, as discussed below, recently imposed an actual malice standard in certain cases.  *See Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 101–02 (2d Cir. 2000) (quoting *Chapadeau v. Utica Observer–Dispatch, Inc.,* 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975)); *Palin v. New York Times Co.*, No. 17-CV-4853 (JSR), 2020 WL 7711593, at *2 (S.D.N.Y. Dec. 29, 2020) (quoting N.Y. Civ. Rights. Law § 76-a).  Second, only falsifiable factual statements can be actionable libel.  Opinions are constitutionally protected.  *Immuno AG.*, 77 N.Y.2d at 254–55.  In deciding these issues, summary judgment on libel claims has "particular value" in avoiding the "chilling effect of protracted litigation."  *Id.* at 256.

A.    *Fault*[3]

The applicability of the actual malice fault standard depends on whether Coleman is a public figure and whether Grand spoke on a matter of public interest.  These are questions of law for the Court.  *See Celle*, 209 F.3d at 176; *Konikoff*, 234 F.3d at 106.

i.    General purpose public figure

A public figure is someone with "general fame or notoriety in the community, and

---

[3] The parties do not dispute that Grand's letter was of and concerning Coleman and that she published it to third parties.

pervasive involvement in the affairs of society." *Gertz*, 418 U.S. at 324. As previewed above, public figure status is a question of law for the Court that places the burden of proof on the defendant. *Krauss v. Globe Int'l, Inc.*, 251 A.D.2d 191, 192, 674 N.Y.S.2d 662 (1st Dep't 1998). If a plaintiff is classified as a public figure, he must then prove by clear and convincing evidence that the defendant acted with actual malice, defined as "knowledge of its falsity or reckless disregard for the truth." *Id.* at 342.

There are two types of public figures: general and limited purpose public figures. General purpose public figures are those who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," and must therefore meet the actual malice standard for all libel claims. *Gertz*, 418 U.S. at 345. To qualify, the person's fame must be "very great; the individual must be a 'household name' on a national scale." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 n.8 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015) (quoting *Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6, 20 n.14 (1st Cir. 2011)). It is the "rare person" who meets this test. *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 137 (2d Cir. 1984).

Grand argues Coleman has achieved sufficient fame as a musician to be considered a general purpose public figure. Def.'s Mem. at 39–40. Coleman began playing music in the 1970s, and has continued performing, touring, giving workshops and releasing albums since. Holzen Report, Dkt. 87-26, ¶ 16; Def.'s 56.1 ¶ 10; *see generally* Coleman Tr. He has received recognition for this work, including a MacArthur Fellowship, a Guggenheim Fellowship and awards from the Doris Duke Charitable Foundation. Holzen Report ¶ 17; Kucsma Report at 5; Coleman Tr. at 46:16–24. Local media coverage from 2015 and 2016 describes him as "a rising giant" in jazz and a recipient of "many awards." *See Morning Call* Article, Dkt. 96-2, at 3;

*Chicago Reader* Article, Dkt. 96-3, at 3.  In 2017 and 2018, publications ranked his albums as among the year's best jazz releases.  Def.'s 56.1 ¶ 9.  Tabloid headlines covering this litigation call Coleman a "famed" and "prominent" saxophonist.  Holzen Report ¶ 25; Dkt. 87-28.

These facts show Coleman has achieved notable success and recognition within the world of jazz—one he described as "small," Coleman Tr. at 309:4–9, and "underground," Dkt. 96-23 at 3—and the broader creative community.  Coleman has sought and attained public attention for his music, including by giving interviews to the media.  *See James v. Gannett Co.*, 40 N.Y.2d 415, 422, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976) (considering media access central to the public figure analysis); *Morning Call* Article; *Chicago Reader* Article.  To classify Coleman as a general purpose public figure, however, his celebrity must be greater than that of a successful musician "well known in some circles." *Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 249 (S.D.N.Y. 2014).  The Court does "not lightly assume" that Coleman's "participation in community and professional affairs render[s] him a public figure for all purposes." *Gertz*, 418 U.S. at 352.  Instead, the Court requires a "clear showing" of fame, asking whether he is a "well-known celebrity" whose name is a "'household word.'" *Horowitz v. Mannoia*, 10 Misc. 3d 467, 469, 802 N.Y.S.2d 917, 921 (Nassau Cty. Sup. Ct. 2005) (quoting *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1294 (D.C. Cir. 1980)).  As Grand has not sufficiently demonstrated that Coleman has reached this high level of celebrity and name recognition, Coleman cannot be classified as a general purpose public figure.

ii.     Limited purpose public figure

Depending upon the circumstances established in the record, a plaintiff can be classified as a limited purpose public figure if he "ha[s] thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345.

11

When such a plaintiff challenges a defendant's statements concerning that controversy as defamatory, to succeed he must show the defendant acted with actual malice. *Id.* at 342.

For courts to categorize a plaintiff as a limited purpose public figure:

A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Lerman*, 745 F.2d at 136–37.

Grand does not contend that Coleman meets this test, arguing instead that he is a public figure for all purposes. In any event, Grand fails at the first factor. There is no evidence that, prior to Grand's email, Coleman successfully sought public attention and influence for his views on matters arguably related to this litigation, such as his relationships, relationships generally or sexual harassment allegations. The record reflects only that Coleman sought and received attention for making music. *Cf. Lerman*, 745 F.2d at 137 (plaintiff was limited purpose public figure in case involving mislabeled nude photos because she had "voluntarily devot[ed] herself to the public's interest in sexual mores, through extensive writing on this topic"); *Pisani v. Staten Island Univ. Hosp.*, No. 06-CV-1016 (JFB) (MLO), 2008 WL 1771922, at *16 (E.D.N.Y. Apr. 15, 2008) (plaintiff was private figure because "[d]efendants have failed to cite any facts showing that [plaintiff's] prominence was related to the topic of the [defendant's] statement"); *Naantaanbuu v. Abernathy*, 816 F. Supp. 218, 225 (S.D.N.Y. 1993) (plaintiff who "sought out the press on matters completely unrelated" to alleged defamation was private figure).

Further, while Grand's email addressed an existing public controversy—as "part of broader discussions regarding sexual assault, sexual harassment and consent in workplaces across the country," *Elliott v. Donegan*, 469 F. Supp. 3d 40, 53 (E.D.N.Y. 2020)—Coleman did

not voluntarily inject himself into and assume prominence in that controversy.  Responding to

Grand's email and bringing this action do not make him a public figure, nor does the fact that his

attorney commented in one newspaper article.  *See Time, Inc. v. Firestone*, 424 U.S. 448, 457, 96

S. Ct. 958, 966–67, 47 L. Ed. 2d 154 (1976) (participating in litigation generally insufficient to

render plaintiff public figure); *Lluberes*, 663 F.3d at 19 ("[A]n individual should not risk being

branded with an unfavorable status determination merely because he defends himself publicly

against accusations."); *Lerman*, 745 F.2d at 136 (plaintiff "dragged unwillingly into the

controversy" is not public figure).  In this light, therefore, Coleman does not meet the test for

classification as a limited purpose public figure.  Consequently, because Grand has not shown

Coleman to be either a general or limited public figure, for litigation purposes he must be treated

as a private figure, which would require Grand to show she spoke on a matter of public interest

in order to have the defamation claim lodged against her by Coleman adjudged by the more

defense-friendly actual malice standard, as discussed below.

     iii.    <u>Matter of public interest</u>

     Not missing a beat, Grand initially argued that, even if Coleman is not a public figure, her

statements addressed a matter of public concern, requiring him to show she acted with gross

irresponsibility.  *See* Def.'s Mem. at 40 (citing *Chapadeau*, 38 N.Y.2d at 199).  Seeking now to

raise the bar even higher, Grand argues in a recent submission to this Court that New York's

amended anti-strategic litigation against public participation ("anti-SLAPP") statute—which

applies to communications on issues of public interest—has imposed a new standard that

requires Coleman to show she acted with actual malice.  *See* Def.'s Notice, Dkt. 105 (citing

*Palin*, 2020 WL 7711593; N.Y. Civ. Rights. Law § 76-a).

     It was an important tweak to New York law.  New York courts have long held that, if a

defendant's allegedly defamatory statements involve a matter "arguably within the sphere of legitimate public concern," the plaintiff bears the burden of showing, by a preponderance of the evidence, that the defendant made those statements "in a grossly irresponsible manner." *Konikoff*, 234 F.3d at 101 (quoting *Chapadeau*, 38 N.Y.2d at 199). The state's protections for libel defendants speaking on public affairs increased on November 10, 2020, when amendments to New York's anti-SLAPP statute took effect. *See Palin*, 2020 WL 7711593, at *1–2. Indeed, New York's anti-SLAPP law has always imposed an actual malice standard in any "action involving public petition and participation." *Id.*; N.Y. Civ. Rights Law § 76-a(2). The old version of the law defined such actions narrowly, however, covering only those "brought by a public applicant or permittee." *Palin*, 2020 WL 7711593, at *2 (citing *Chandok v. Klessig*, 632 F.3d 803, 819 (2d Cir. 2011)). The amendments, among other changes, broadly expand that definition to include:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or
> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civ. Rights Law § 76-a(1)(a); *see also Palin*, 2020 WL 7711593, at *2.

The only court to have addressed this amendment thus far has it applies in federal court and has retroactive effect. *See Palin*, 2020 WL 7711593, at *3–4. This Court agrees. It is a hornbook rule that "federal courts sitting in diversity apply state substantive and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427, 116 S. Ct. 2211, 2219, 135 L. Ed. 2d 659 (1996). The anti-SLAPP provision at issue here, § 76-a, applies in federal court because it is "manifestly substantive," governing the merits of libel claims and increasing defendants' speech protections. *Id.*; *cf. La Liberte v. Reid*, 966 F.3d 79, 86 n.3 (2d

Cir. 2020) (finding California anti-SLAPP law's "special motion to strike" procedural); *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (finding Nevada anti-SLAPP law's provisions on immunity from civil liability and fee-shifting substantive); *Egiazaryan v. Zalmayev*, No. 11-CV-2670 (PKC), 2011 WL 6097136, at *12 (S.D.N.Y. Dec. 7, 2011) (applying New York's pre-amendment anti-SLAPP law in diversity jurisdiction case).

Having found § 76-a to be substantive and applicable in federal court, the question becomes whether that application can be retroactive.  New York's statutory amendments "are presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated."  *In re Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117, 122, 726 N.Y.S.2d 45, 749 N.E.2d 724 (2001).  New York, moreover, is in harmony with the general rule that legislation considered "remedial," "should be given retroactive effect in order to effectuate its beneficial purpose."  *Id.*  So, too, should legislation regarding which the Legislature "conveyed a sense of urgency," or aimed "to rewrite an unintended judicial interpretation."  *Id.*  Overall, these legislative statements must amount to a "'persuasive reason' for the 'potentially harsh' impacts of retroactivity."  *Regina Metro. Co., LLC v. New York State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 375, 130 N.Y.S.3d 759, 154 N.E.3d 972, 995 (2020) (internal citation omitted).

The anti-SLAPP amendments are just such remedial, retroactive legislation.  The memorandum accompanying the bill's introduction states that "as drafted, and as narrowly interpreted by the courts, the application of Section 76-a has failed to accomplish [its] objective." S52A Sponsor Mem. (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52.  The memorandum expresses the specific intent that the proposed amendments will "better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law":

to protect the free exercise of speech, particularly in public fora on matters of public interest.  *Id.*  The bill became effective "immediately."  *Id.*  Under New York law, these clear legislative expressions of remedial purpose and urgency give the amendments retroactive effect.  *See Palin*, 2020 WL 7711593, at *5 (quoting *Gleason*, 96 N.Y.2d at 123 ("These factors together persuade [the Court] that the remedial purpose of the amendment should be effectuated through retroactive application.")).  Nor, furthermore, does retroactive application offend due process where, as here, plaintiff will face no "harsh impacts" from retroactive application.  *See id.* at *5.  Coleman has already hitched his wagon to the actual malice standard, which he claims to satisfy.  *See* Pl.'s Mem. at 8–10.

Applying New York's amended anti-SLAPP law, the Court finds Coleman must prove Grand acted with actual malice because he brings "a claim based upon . . . lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest."  N.Y. Civ. Rights Law § 76-a(1)(a).  This interpretation is guided not only by the legislative intent of the amendment, but also by its directive to construe "public interest" broadly, as encompassing all but purely private matters.  S52A Sponsor Mem.   The Court is guided by this legislative directive, as well as the New York courts' "extremely broad interpretation" of statements on "matters of public concern," which likewise receive heightened protections.  *Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001).  In that regard, New York law considers a matter of public concern as "a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants."  *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298, 445 N.Y.S.2d 156 (2d Dep't 1981) (quoting *Waldbaum*, 627 F.2d at 1296).  This includes "a matter of political, social, or other concern to the community," even if it does not "affect the general population."  *Abbott v. Harris Publications,*

*Inc.*, No. 97-CV-7648 (JSM), 2000 WL 913953, at *7 (S.D.N.Y. July 7, 2000).  That said, "publications directed only to a limited, private audience" are deemed by those same New York courts as "matters of purely private concern."  *Id.* at 270 (quoting *Huggins v. Moore*, 94 N.Y.2d 296, 303, 704 N.Y.S.2d 904, 726 N.E.2d 456 (1999)).  Following logically, statements falling "into the realm of mere gossip and prurient interest" are also deemed matters of private concern. *Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 595, 550 N.Y.S.2d 251, 549 N.E.2d 453 (1989).

Here, Grand defines the issue of public interest as "sexual impropriety and pressure in the music industry."  Pl.'s Mem. at 40.  The Court assesses the topic at the time of her allegedly defamatory statements.  Grand sent her email and letter on November 17, 2017, amid the rising tide of public concern over workplace sexual harassment known as the #MeToo movement. Following the reporting of sexual assault allegations against Harvey Weinstein, "#MeToo catapulted into the public's consciousness in October 2017."  *Elliott*, 469 F. Supp. 3d at 51. People began engaging in "widespread and difficult conversations about what constitutes inappropriate behavior in professional settings and how to construe consent in sexual relationships between prominent industry players and those seeking opportunities within that industry."  *Id.* at 52.  Against this backdrop, the Court finds that sexual impropriety and power dynamics in the music industry, as in others, were indisputably an issue of public interest at the time Grand sent her email.

Grand's email and letter marked her foray into these conversations.  She quite clearly frames them as her contribution to the larger discussions occurring at the time of the #MeToo movement.  Her email begins by saying she is joining the "talk[] about sexism in the music industry" by sharing her own experiences.  Grand Email at 2; *see Huggins*, 94 N.Y.2d at 304 (finding articles on parties' divorce addressed matter of public concern by "show[ing] the greater

significance of [defendant's] personal story").  Her letter starts by saying she wants to "speak up" in part "for the sake of other young women."  Grand Letter at 2.  Coleman acknowledges this context, saying Grand wrote "as part of the broader #MeToo movement."  Pl.'s Reply, Dkt. 92, at 8.  Further adding to the public interest in Grand's statements, while Coleman does not have the household-name status that qualifies him as a general purpose public figure, he remains a prominent musician of interest to the jazz community.  *Cf. McKee v. Cosby*, 874 F.3d 54, 62 (1st Cir. 2017) (finding sexual assault allegations against actor Bill Cosby were public controversy).

These findings set the litigation battlefield.  Because Grand's statements were "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest," Coleman must show she spoke with actual malice.  N.Y. Civ. Rights Law § 76-a(1)–(2).  This requires him to "establish[] by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false."  *Id.* § 76-a(2).  Importantly, "[d]espite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication."  *Behar*, 238 F.3d at 174; *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S. Ct. 2419, 2429, 115 L. Ed. 2d 447 (1991) (actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will").

In assessing the defendant's subjective doubts as to the publication's truth, a "court typically will infer actual malice from objective facts."  *Celle*, 209 F.3d at 183.  These facts may include "the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story."  *Id.* (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)).  Significant on this motion, courts may make this

determination on summary judgment, which should be granted if no reasonable factfinder could find, by clear and convincing evidence, that the defendant acted with actual malice. *See, e.g.*, *id.*; *Anderson*, 477 U.S. at 257.

Coleman argues that his claim satisfies the actual malice standard, making two proffers of evidentiary support. Pl.'s Mem. at 8–10. First, he points to a line in Grand's email saying "it's not public at the moment because it's legally dangerous for me to publish this (even though I've removed any mention of names)." *Id.* at 10 (quoting Grand Email at 2). Relatedly, he notes that Grand wrote in an email to a friend and colleague that she was not going to name Coleman because "I spoke with an attorney and apparently it's very dangerous for me legally to post this, because then he can sue me for damages incurred if he loses any work, or for defamation," and made similar statements to another friend. *Id.* (quoting Dkt. 82-13 at 52). Coleman claims that because it is known that speaking the truth is legal, Grand's statements show that she knew her words were false. *Id.* Second, he argues that by authorizing a different friend and colleague to circulate the letter within the industry and to journalists, and to name Coleman in doing so, Grand showed "her true motive was revenge." *Id.*; Dkt. 82-13 at 14, 20, 24–25, 31.

Neither of these proffers shows Grand acted with actual malice. While Grand could theoretically have feared a defamation suit because she knew her words were false, she could also have feared suit because she, and the attorney she consulted, believed Coleman might sue regardless of whether she spoke truthfully. Grand says just that—rooting her fears in her awareness that meritless defamation suits can be brought as "punishment," and saying she never had or voiced any concerns with her letter's truthfulness. *See* Def.'s Opp'n Mem., Dkt. 93, at 27; Grand Opp'n Decl., Dkt. 95, ¶ 24. Indeed, New York amended its anti-SLAPP law to counter the same phenomenon Grand cites: suits aimed at chilling speakers' public participation.

*See* S52A Sponsor Mem.  Both theories are plausible but what is crucial is that Coleman offers

no facts proving, by clear and convincing evidence, that Grand knowingly or recklessly made

false statements.  *See Anderson*, 477 U.S. at 254 ("[T]here is no genuine issue if the evidence

presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder

of fact to find actual malice by clear and convincing evidence.").

    As to Coleman's argument that Grand was motivated by revenge when she authorized the

letter's circulation, this also does not show actual malice.  Evidence of ill will can occasionally

support a finding of actual malice in combination with other clear and convincing evidence, but

"standing alone . . . [it] is not sufficient to establish actual malice." *Celle*, 209 F.3d at 183.  The

actual malice standard focuses not "on the defendant's attitude toward the plaintiff," but rather

"on the defendant's attitude toward the truth," so Grand's feelings toward Coleman do not speak

to actual malice.  *Konikoff*, 234 F.3d at 99.  At any rate, authorizing a friend to share her letter

does not show she knowingly or recklessly disregarded the truth of that letter, just that she

wanted others to read it.

    Grand further refutes a finding of actual malice by stating that she wrote her email and

letter only from first-hand knowledge, carefully edited it with friends before sending and, albeit

naively, hoped to contain its distribution.  Def.'s Opp'n Mem at 27; Pl.'s 56.1 ¶ 17; Dkt. 82-13 at

50–69.  At bottom, Coleman fails to meet his burden to show, by clear and convincing evidence,

that Grand acted with actual malice and, as a result, he cannot prevail on his defamation claim

against her.[4]  But, importantly, it is not the only reason.

---

[4] Nor could Coleman show Grand acted grossly irresponsibly in sending her letter—the
longstanding fault standard applied to matters of public concern under New York law. *Konikoff*,
234 F.3d at 101.  That standard is objective, requiring a plaintiff to show by a preponderance of
the evidence that the defendant spoke without "due consideration for the standards of
information gathering and dissemination ordinarily followed by responsible parties." *Id.*

B.        *Statements of Opinion*

Because falsity is an element of a libel claim, a statement must consist of falsifiable facts

in order to be actionable.  Opinions, by contrast, are constitutionally protected.  *Gross v. New*

*York Times Co.*, 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993).  Coleman

argues Grand's statement consists of falsifiable, and false, facts about him, while Grand

maintains she was sharing her subjective opinions on their relationship.  *See* Def.'s Mem. at 17–

25; Pl.'s Reply at 2–6.  To determine which is correct, it must be asked "whether the reasonable

reader would have believed that the challenged statements were conveying facts about the libel

plaintiff."  *Immuno AG.*, 77 N.Y.2d at 254.  Although this question can prove difficult to answer,

it is one of law, properly—and preferably—decided by the Court on summary judgment.  *Id.* at

256.  In this decisional framework, Coleman bears the burden to show the challenged statement

is fact, not protected opinion.  *Celle*, 209 F.3d at 179.

To determine whether Grand's statements are protected opinion, the Court examines:

(1) whether the specific language in issue has a precise meaning which is readily
understood; (2) whether the statements are capable of being proved true or false;
and (3) whether either the full context of the communication in which the
statement appears or the broader social context and surrounding circumstances are
such as to signal readers or listeners that what is being read or heard is likely to be
opinion, not fact.

*Gross*, 82 N.Y.2d at 153 (internal citations and quotations omitted).

To begin, some of Grand's language has a precise meaning and some does not.  Taking,

for example, her statements about meeting Coleman, "I met him at 17 at a workshop" clearly has

a precise meaning, while "I also felt this really strong sexual vibe coming from him in the way

---

(quoting *Chapadeau*, 38 N.Y.2d at 199).  Neither of Coleman's evidentiary proffers shows gross
irresponsibility, especially given that Grand's motives are irrelevant under this objective
standard.

he looked at me" does not.  Grand Letter at 2.  Second, some of Grand's statements are capable of being proven true or false, and others are not.  For example, Coleman takes issue with her line, "About 6 months after I moved to New York in 2011, he convinced me to be intimate with him." *Id.* at 4.  Yet whether Coleman persuaded Grand to sleep with him, as she says, or whether Grand pursued him to advance her career, as he says, is not determinable by this Court.  These are "inherently subjective evaluations of intent and state of mind, which are matters not readily verifiable and intrinsically unsuitable as a foundation for defamation." *Cummings v. City of New York*, 2020 WL 882335, at *22 (S.D.N.Y. Feb. 24, 2020).  Additionally, other statements are both verifiable and undisputed, such as the basic timeline of their relationship.

Third, the full context of Grand's email and letter supports a finding that readers are likely to consider them as opinion.  In undertaking this critical, and dispositive, prong of the analysis, the Court is mindful that the "hypertechnical parsing of a possible 'fact' from its plain context of 'opinion'" imperils "the cherished constitutional guarantee of free speech." *Immuno AG.*, 77 N.Y.2d at 256.  Importantly, an opinion does not become actionable because its author includes supporting facts.  An opinion that offers "a full recitation of the facts on which it is based is readily understood by the audience as conjecture" and allows readers to make up their own minds, so is nonactionable.  *Gross*, 82 N.Y.2d at 154.  Conversely, an opinion that implies the existence of undisclosed facts is actionable, as readers are likely to assume those facts are unfavorable to the statement's subject.  *Id.* at 153–54.

In evaluating the competing contentions, the summary judgment court first looks to "the full context of the communication in which the statement appears." *Id*. at 153.  Grand frames her statements as personal opinions on her turbulent relationship with Coleman, and adds supporting facts.  Her email begins, "There's been lots of talk[] about sexism in the music industry. I wrote

a long letter about my experience with it." Grand Email at 2. She writes that she hopes to "be the start of a larger conversation about what's acceptable and what's not." *Id.* She starts her letter similarly, writing "[t]here's been a lot of talk about sexism lately, and I feel that I should speak up about the way sexism has affected me." Grand Letter at 2. These statements create a context in which Grand's letter is read as describing her subjective experience, allowing readers to decide for themselves "what's acceptable."

Coleman counters that the letter cannot be read as opinion because it falsely alleges criminal sexual misconduct, pointing to Grand's mentions of "sexual harassment," an "abusive dynamic" and being a "victim," among similar statements. Pl.'s Reply at 3–4. Yet the letter's full context remains one of opinion supported by disclosed facts, and its language is more nuanced than Coleman claims. For example, Grand says, "I don't intend to cast myself as only a victim of the situation" but "I do want to shed light on the strange process that happens when you enter this type of abusive dynamic and how this dynamic is embedded in the sexism that goes through our society." Grand Letter at 2. This line is consistent with a letter sharing personal opinions on a difficult relationship and related societal issues.

Furthermore, Grand does not allege criminal, non-consensual sex, as Coleman claims. She describes experiencing "sexual harassment," but recounts only instances in which Coleman tried to convince her to have sex but gave up after she refused—not instances in which he persisted despite her refusal. And, Grand supports her assertion that she was harassed by disclosing relevant facts.[5] Even if she had alleged criminal conduct, and even though allegations

---

[5] Coleman argues that Grand implied the existence of undisclosed facts by offering to show text messages to interested readers as "proof." Pl.'s Reply at 3–4. Yet by saying the texts are "proof for most of what [she] is talking about here," Grand implies that they support exactly the facts described in the letter, not some other set of undisclosed allegations. The law does not require that Grand include all primary source material, just that she recite the facts supporting her

of sexual harassment can be actionable, Grand's letter remains protected opinion.  Just as "assertions that a person is guilty of 'blackmail,' 'fraud,' 'bribery' and 'corruption' could, in certain contexts, be understood as mere, nonactionable 'rhetorical hyperbole' or 'vigorous epithet[s]'" or, "even when uttered or published in a more serious tone," nonactionable if based on disclosed facts and framed as "personal surmise built upon those facts," indeed a claim of harassment supported by facts can be protected opinion.  *Gross*, 82 N.Y.2d at 155; *see also Melius v. Glacken*, 94 A.D.3d 959, 961, 943 N.Y.S.2d 134 (2d Dep't 2012) (finding statement that plaintiff was "extortionist" nonactionable where supported by factual statement that "plaintiff's lawsuit was seeking an amount 'far in excess of the appraised value' of the property.'").  Reading the language Coleman quotes in the context of the full letter—which begins and ends by saying it is a personal narrative and adds supporting facts in the middle—supports a finding that the letter is protected opinion.

Last, the Court pans out to review "the broader social context and surrounding circumstances."  *Gross*, 82 N.Y.2d at 153.  Coleman contends that readers aware of the #MeToo movement would see Grand's statements as factual, since the movement's "greatest weapon" is making factual accusations "to out and ostracize sexual abusers."  Pl.'s Reply at 8.  Yet while the movement inspired some to make factual, verifiable assault claims, it led others to opine on complex topics like the role of sex in professional relationships.  From their first lines, Grand's email and letter tell readers she is doing the latter, adding her narrative to industry-wide talks.  Additionally, "the surrounding circumstances make clear both that plaintiff and defendant[] have had a turbulent relationship and that the recipients of the e-mail were aware of the ongoing disputes between them," cutting against the notion that readers would see the email as conveying

opinions, which she does.  *Gross*, 82 N.Y.2d at 153.

objective truths.  *Kidd v. Epstein*, 79 A.D.3d 650, 651, 915 N.Y.S.2d 38 (1st Dep't Dec. 28, 2010).  Considering Grand's statements in all their context, the Court finds they are protected opinion as a matter of law.  For this reason too, summary judgment must be awarded to Grand on Coleman's libel claim.[6]

II.  Grand's Defamation Counterclaim

Now, for the flip side, subject to the same legal standards used to evaluate his libel claim against her, Coleman moves for summary judgment on Grand's defamation counterclaim.  Pl.'s Mem. at 16.  Grand defends by arguing that two of Coleman's communications were defamatory.  Def.'s Opp'n Mem. at 28–31; *cf.* Ans. to Am. Compl. ¶¶ 75–92.  First in the spotlight is Coleman's May 5, 2018 email to over 80 recipients, addressed to the We Have Voice Collective, which asserted that Grand made "false accusations," "was consciously trying to manipulate emotions of sympathy from the recipients of her letter" and "deliberately left [] out" the "sexual aggression on her part."  Def.'s Opp'n Mem. at 28 (quoting Coleman Email at 2–3).  Coleman's communication explanation explained that he wrote to "stop the bullying, intimidation, black-balling and lying from continuing."  *Id.* (quoting Coleman Email at 3)*.*  Second on Grand's target list is Coleman's October 24, 2018 Facebook post claiming Grand "covertly spread misinformation," "deliberately lied" about their relationship and "co-opt[ed] the very necessary, warranted and powerful #MeToo movement."  *Id.* at 28–29 (quoting Dkt. 87-24 at 1).  Coleman responds only that Grand did lie, so he did not defame her by saying so.  Pl.'s Mem. at 16.

---

[6] Because the Court finds Coleman fails on the fault and falsity elements, it declines to reach the question of injury.

Here, too, the fact versus opinion distinction is dispositive.[7]  Grand claims that, unlike her own letter, Coleman's is factual because it says she "ma[de] false accusations" of sexual harassment.  Courts considering similar statements have found some actionable and others protected opinion, depending on their context.  *See Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 151 (S.D.N.Y. 2016); *Schmitt v. Artforum Int'l Magazine, Inc.*, 178 A.D.3d 578, 588, 115 N.Y.S.3d 291 (1st Dep't 2019).

Like Grand's letter, Coleman's uses both language that is capable of precise meaning and falsifiable, and language that is not.  Some of the lines Grand challenges as libelous are unverifiable speculation on her motives, such as Coleman's statement that she "was consciously trying to manipulate emotions of sympathy from the recipients of her letter" by omitting her "sexual aggression."  Def.'s Opp'n Mem. at 28 (quoting Coleman Email at 3); *see also Cummings*, 2020 WL 882335, at *22.

Also like Grand's letter, the letter's immediate and broader social context signal to readers that the letter contains opinion, not fact.  *Gross*, 82 N.Y.2d at 153.  Coleman introduces his letter by saying that while he had "hesitated in publicly telling my side of the story," he believed he "must speak up now or forever allow hers to be the only on-the-record narrative," giving readers "both sides of the story."  Coleman Email at 2.  He ends by inviting readers' responses, saying he "cannot control what each of you will think about this" but is "open to dialogue."  *Id.* at 3.  As in Grand's letter, this framing indicates to readers that Coleman is

---

[7] Unlike in the briefing on Coleman's claim, in the briefing on Grand's defamation counterclaim, the parties do not address the applicable fault standard.  While Grand is not famous enough to be a general purpose public figure, her participation in the public controversy of the music industry's #MeToo movement could render her a limited purpose public figure on that topic. The burden to establish public figure status rests on the defendant, however, and Coleman has made no such showing here.  *See Krauss*, 251 A.D.2d at 192.

offering his version of the story and expects readers to have their own views.

The social context bolsters this conclusion.  Coleman wrote to recipients of Grand's letter and others he thought had read it, so readers were likely aware of their rocky relationship and sharply divergent perspectives.  *See Kidd*, 79 A.D.3d at 651.  For any who were not, the letter provides this context, saying their relationship was "unusual, intense, argumentative and passionate" and "did not end well."  Coleman Letter at 2.  His references to the #MeToo movement, such as "the rights of individuals being accused," further signal that he is voicing his opinion on controversial topics.  *Id.* at 3.

Further, Coleman disclosed the facts supporting his assertion that Grand's claims were false.  The body of the letter describes consensual sexual encounters, and the "addendum" contains text messages with Grand about those encounters.  *Cf. McKee*, 874 F.3d at 63 (finding letter nonactionable because it "adequately disclosed the non-defamatory facts underlying [defendant's] assertions," including "citations to articles and other sources" and "extensive underlying facts").  Coleman does not imply the existence of undisclosed facts.  He says he has not included all of their texts, but readers would not expect him to, nor draw adverse inferences against Grand because he did not.  *See id.*; *Gross*, 82 N.Y.2d at 153.

In much the same way, Coleman's October 24 Facebook post is also protected opinion. It is a mix of precise, falsifiable statements and vague, unverifiable allegations as to Grand's motives in "covertly spread[ing] misinformation" to "ruin my reputation."  Dkt. 87-24.  Coleman frames the post as one sharing his side of the story, saying he and Grand were "presenting our evidence" and respective "positions."  *Id.*  He shares his opinion on the #MeToo movement, calling it "very necessary" but accusing Grand of "co-opting" it.  *Id.*  He calls Grand's claims false, but discloses the supporting facts—this time by excerpting the complaint in this action.  He

includes almost all of the complaint, and correctly notes that it is a matter of public record, so does not imply the existence of undisclosed facts.  With each of Coleman's challenged statements falling, like Grand's, into the category of nonactionable protected opinion, Coleman is entitled to summary judgment on Grand's defamation counterclaim.

Grand's counterclaim also fails as to the Facebook post under the same amended New York anti-SLAPP statute she invoked in her defense.  Her claim is an "action involving public petition and participation," as it is based on a "communication in a place open to the public or a public forum in connection with an issue of public interest."  N.Y. Civ. Rights Law § 76-a(1)(a); *see also id.* § 76-a(1)(b) (including counterclaims); *Palin*, 2020 WL 7711593, at \*2.   Facebook is a public forum within the meaning of New York's anti-SLAPP law, just as it is under other states', and Coleman posted on his public Facebook page, generating dozens of comments.  *See* Dkt. 87-24; *Stark v. Lackey*, 136 Nev. 38, 42, 458 P.3d 342, 346 (2020) (finding Facebook public forum under Nevada's anti-SLAPP law); *Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 222 Cal. Rptr. 3d 250, 258 (2017) (same, under California's, since Facebook and the pages at issue were "accessible to anyone who consents to Facebook's Terms"); *Cevetillo v. Lang*, No. 19-CV-6031687 (TRT), 2019 WL 7597451, at \*5 (Conn. Super. Ct. Dec. 13, 2019) (same, under Connecticut's); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1737, 198 L. Ed. 2d 273 (2017) (calling Facebook and other social networking sites the "modern public square"); *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) (finding President Trump's use of his Twitter account created public forum).  Coleman's post addresses the #MeToo movement which, as discussed above, is an issue of public interest.  *See* Dkt. 87-24 at 1; *Elliott*, 469 F. Supp. 3d at 51.  Grand therefore must prove by clear and convincing evidence that Coleman acted with actual malice—that he knowingly or recklessly made false

statements in his Facebook post.  N.Y. Civ. Rights Law § 76-a(2).  She fails to argue Coleman is

liable under any fault standard, so cannot meet her burden to show actual malice.  *Cf. Celle*, 209

F.3d at 183.  For this additional reason, Grand's defamation counterclaim fails as a matter of law.

III.    Grand's IIED Claim

    Last, Coleman moves for summary judgment on Grand's IIED claim, in which Grand

alleges he "repeatedly and continually attempted to intimidate and distress [her] because she

refused to engage in sexual acts with [him] and because she wrote the Letter."  Ans. to Am.

Compl. ¶ 95; Pl.'s Mem. at 17–19.  Under New York law, an IIED claim has four elements: "(1)

extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal

connection between the conduct and the injury, and (4) severe emotional distress."  *Bender v.

City of New York*, 78 F.3d 787, 790 (2d Cir. 1996).

    Clearly, IIED "is a highly disfavored cause of action under New York law, one that is

almost never successful."  *Collins v. Giving Back Fund*, No. 18-CV-8812 (CM), 2019 WL

3564578, at *14 (S.D.N.Y. Aug. 6, 2019).  Claims typically fail as a matter of law on the first

element.  *See Howell v. New York Post Co.*, 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d

699 (1993).  "'Liability has been found only where the conduct has been so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized society.'"  *Stuto v. Fleishman*, 164

F.3d 820, 827 (2d Cir. 1999) (quoting *id.* at 122).  Even showing a defendant acted with tortious,

criminal or malicious intent is insufficient.  *Id.* (quoting Restatement (Second) of Torts § 46 cmt.

d (1965)).

    Grand does not clear this high bar.  She claims Coleman used his age and prominence to

"manipulate" her into a sexual relationship; that he threatened her career, "withheld performance

opportunities" and "yelled at her" when she declined sex; and attended her shows "knowing that his presence would distress" her and refused to leave when asked.  Ans. to Am. Compl. ¶¶ 96–98.  She alleges that, after she wrote the letter, Coleman directed others to "repeatedly bully and threaten [her] with public legal action" in emails, texts and on social media, and engaged in "continued harassment."  *Id.* ¶¶ 99, 103; Def.'s Opp'n Mem. at 31–32.

Grand correctly notes that sexual harassment can form the basis for an IIED claim, provided "the continuous nature of the conduct [] make[s] it so outrageous and extreme as to be actionable."  *Bonner v. Guccione*, 916 F. Supp. 271, 276–77 (S.D.N.Y. 1996); Def.'s Opp'n Mem. at 31.  However, "[a]cts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities" are insufficiently "outrageous" to constitute IIED.  *Semper v. New York Methodist Hosp.*, 786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011) (quoting *Stevens v. New York*, 691 F. Supp. 2d 392, 399 (S.D.N.Y. 2009)).

While the record shows Coleman and Grand had a difficult relationship that left lasting marks on each, it does not, as a matter of law, reflect acts meeting the exceedingly high bar required to constitute IIED.  Further, to the extent Grand's IIED claim is based on alleged libel by Coleman or others responding to her letter, "defamatory statements generally cannot [be pleaded as] the extreme and outrageous behavior required" by New York law to assert an IIED claim.  *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 729 (S.D.N.Y. 2014).  The Court therefore grants summary judgment for Coleman on Grand's IIED claim.

Conclusion

For the foregoing reasons, both parties' defamation claims and Grand's IIED counterclaim fail as a matter of law, and the respective cross-motions of the parties are resolved

correspondingly.  The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.


Dated:   Brooklyn, New York
         February 22, 2021


/s/ Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge